No. 15,035.

CLINE *v.* KNIGHT ET AL., MEMBERS OF THE BOARD OF
DIRECTORS OF SCHOOL DISTRICT NUMBER ONE
OF THE CITY AND COUNTY OF DENVER ET AL.
(137 P. [2d] 680)

Decided February 23, 1943.    Rehearing denied April 26, 1943.

Mr. FOSTER CLINE, Mr. CARL CLINE, Mr. KENNETH LORRIN SMITH, for plaintiff in error.

Mr. S. ARTHUR HENRY, for defendants in error.

*En Banc.*

MR. JUSTICE HILLIARD delivered the opinion of the court.

A SUIT involving residence for school purposes. Plaintiff in error is Gladys Cline, an infant, appearing by Foster Cline, her uncle and next friend. Defendants in error are the members of the board of directors of school district number 1 of the City and County of Denver, and the school district as such.

Gladys was born August 19, 1931, at a hospital in Denver. Six days thereafter, at the same hospital, her mother died. For six months Gladys continued living at the hospital where she was born, and continuously since has lived in Denver at the home of her maternal aunt, Mrs. Wesley W. Kemp. Gladys has never lived anywhere except at the Denver hospital and in the commodious and comfortable Denver home owned by Mrs. Kemp and her husband, a home that is otherwise childless. While during this period the father has contributed thirty dollars per month for the benefit of Gladys, the aunt has had exclusive charge of her, performing all the usual duties incident in the rearing of a child. Gladys has not been adopted or emancipated. The expenses incurred have been greater than thirty dollars per month, the excess being borne by the aunt and uncle. The father resided without Denver at the time of the birth of Gladys, and hitherto has so resided. For more than seven years following the death of the child's

mother he remained a widower. He is now married and lives with his wife in a house, presumably comfortable, in an adjoining county. Near by are public schools which we judicially notice are adequate. He earns from his profession five to ten thousand dollars per year which is the same in amount as the income of the uncle in Denver where Gladys resides. The father is not a party to this suit, nor is Mrs. Kemp or her husband. Gladys, aged eight years at the time of instituting this suit, and, until the action of the Denver school authorities, presently to be stated, had been attending the public schools in Denver tuition free. She desires to retain her residence within Denver and as an incident thereof to continue in school under the same terms.

October 13, 1939, the Denver school board, proceeding under the theory that Gladys was a nonresident of Denver, denied her the privilege. November 4, following, she filed an injunction suit in which she alleged she was a resident of Denver and between six and twenty-one years of age, based whereon she prayed to enjoin defendants in error from refusing school privileges to her. She suffered adverse judgment.

By section 111, chapter 146, '35 C.S.A., it is provided: "The residence of an unmarried person of school age shall, in all cases, be held to be identical with the bona fide residence of the parent or guardian of such person, providing that such parent or guardian be a resident of the state." Section 290, Ibid., provides: "Every public school shall be open for the admission of all children, between the ages of six and twenty-one years, residing in that district without the payment of tuition; and the board of education shall have power to admit adults and children not residing in the district if they see fit to do so and to fix the terms of such admission. A child shall be deemed to reside in a school district if: (1) both his parents reside, or the survivor of them, or the one of them to whom custody of such child shall have been awarded by any court of competent jurisdiction, resides

in the school district; ***." Section 89 (1), chapter 146, 1941 Supp. '35 C.S.A. (S.L. 1939, chapter 152), including the title, reads: "Schools. Nonresident Pupils. An Act Relating to the School Attendance of Nonresident Pupils. Be it enacted by the General Assembly of the State of Colorado: Section 1. Every board of education shall have the power to exclude from the schools of the district under its control, or to fix the terms of admission for, a pupil whose parent or parents reside in some other school district if in the judgment of the board of education the pupil does not need to be in the school district in order to have a home and the necessities of life. However, if (in) the judgment of the board of education the pupil needs to be in the school district in order to have a home and the necessities of life, the board of education is hereby authorized to waive all tuition costs." The Colorado Constitution, section 2, article 9, reads, in part: "The general assembly shall, as soon as practicable, provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state, wherein all residents of the state, between the ages of six and twenty-one years, may be educated gratuitously."

Under the Constitution and acts quoted, the question is: In what school district does Gladys Cline, admittedly a resident of Colorado and within the ages enumerated, have her residence for school purposes?

The leading case in this jurisdiction is *Fangman v. Moyers,* 90 Colo. 308, 8 P. (2d) 762. As summarized by counsel for plaintiff in error the facts in that case were: "Moyers, an attorney, lived in Alamosa and practiced law there. His son, Billy, was placed in the home of one Swift, which home was in a different school district than Alamosa. There was no family relationship between Swift and Moyers, and no reason for Billy's being placed in the Swift home other than 'for the sole purpose of giving him a home with desirable influence and surroundings.' Since, as it appears from the records in the

case, Moyers paid the Swifts for Billy's board, and since it does not appear that there were any other operative facts which would render the Swift home more desirable for Billy than many other homes in which Billy could have been placed, there were no urgent reasons why Billy should reside at the Swift home in preference to a home obtainable with some family in the district in which Mr. Moyers resided—Alamosa. * * * . It does not appear in the case, nor do the records reveal, that Mr. Moyers was financially unable to pay the small amount of tuition asked. The court said that 'the sole question here presented is the district of Billy's residence for school purposes. ' " A further statement containing additional facts appears in the brief filed by defendants in error: "In the Moyers case, as clearly appears, Billy Moyers' father himself had no real home in which the child could have lived. The father himself was living in a rented room. He was eating his meals at scattered restaurants. He was a stranger from a distant state, facing the difficult problem of getting a start as a lawyer in a new and strange community. There was in the Moyers case no question of choice between two available homes * * * . The stark question there was to try to get any kind of home at all." The trial court adopted the view of defendants in error and thus distinguished this case from the Moyers case.

In the Moyers case, speaking through Mr. Justice Burke, and after quoting section 8353, C.L. 1921, now section 111, quoted above, we said: "The district's principal argument is based upon this language, and the conclusion is drawn therefrom that Billy must be held to be a resident of Alamosa because that is the residence of his father." "It is unquestionably true," Mr. Justice Burke continued, "that 'generally speaking domicile and residence mean the same thing' (*Kennedy v. Ryall,* 67 N. Y. 379, 386.); that 'in general children whose parents are nonresidents of a district are not permitted to attend schools therein' (25 Am. and Eng. Enc. of Law [2d ed.]

p. 22); and that children 'temporarily' with relatives in one district yet have their school residence in the district where their only living parent resides (*Hudson v. Mattingly*, 69 Colo. 528, 195 Pac. 113). But Billy's residence in the Mosca district cannot be properly called 'temporary,' nor do the facts surrounding that residence bring it within the 'general' rule referred to."

■ "The terms 'domicile' and 'residence' *** are not synonymous *** in statutes setting forth residence requirements entitling children to school privileges." 17 Am. Jur., p. 595, §10. "Although there is some conflict among the decisions as to what constitutes a residence which will entitle a child to school privileges, statutes providing for a free public school system are, by the weight of authority, construed as evidencing an intention on the part of the state that all the children within its borders shall enjoy the opportunity of a free education, and in determining whether a person is or is not a resident in a school district within the meaning of such a rule, the usual and ordinary indicia of residence or the absence thereof should be the proper guide. In line with this construction of the statutes, residence entitling an infant to school privileges is distinguished from domicile, or the technical and narrow use of the term 'residence,' for the purpose of suffrage or other like purposes, and it is construed in a liberal sense as meaning to live in, or be an inhabitant of, a school district, the purpose being not to debar from school privileges any child of school age found within the school district under the care, custody, or control of a resident thereof. Such rule does not usually require that there shall be a legal domicile, but it is sufficient if the child and its parent, or the person in loco parentis, are actually resident in the district, with apparently no present purpose of removal." 24 R.C.L. 624.

In deciding that the residence of Billy Moyers was that of the Swift family, and not that of his father, we adopted, as fairly expressing our views, language found

in the opinion in *McNish v. State,* 74 Neb. 261, 104 N. W. 186, as follows: "In the incidents of human life families are broken up and must be scattered, by the necessities of obtaining a livelihood, by death of one or both parties, or by abandonment of offspring, as in this case. Such children, as all others, are the wards of the state, to the extent of providing for their education to that degree that they can care for themselves and act the part of intelligent citizens. To secure these ends, laws relating to public schools must be interpreted to accord with this dominant, controlling spirit and purpose of their enactment, rather than in the narrower spirit of their possible relations to questions of pauperism and administration of estates." See, also, *State v. Thayer,* 74 Wis. 48, 41 N. W. 1014.

Subsequent to our decision in the Moyers case the legislature enacted section 290, supra. It is sufficient to say that had said statute been in effect when that decision was rendered the result would have been the same.

■■ When all these several statutes, including section 89 (1), supra, are considered as one, as they should be, for none of the later statutes repeal the earlier ones, it will be found that the latest enactment grants additional powers to local boards that they may be more able to carry out the beneficent provisions of the Constitution to the end that there shall be "a thorough and uniform system of free public schools throughout the state." The purpose of the legislature was not to make education less free; it was to make it more so. Greater leeway was granted to school boards to permit children who were not residents within their district to attend their schools without payment of tuition. It is true that in the same act the boards were given power to exclude pupils whose parents reside in some other school district; however, a similar statute was in effect prior to our decision in the Moyers case and we adhere to that holding for the reasons therein stated. In construing the 1939 act we are not only concerned with the body

thereof, but with its title, which is reemphasized here. "Schools. Nonresident Pupils" and "An Act Relating to the School Attendance of Nonresident Pupils." It is clear that the legislature had in mind the rule laid down in *Fangman v. Moyers, supra,* and that the general rule of residence does not function. Where the residence is temporary; where the child is placed with relatives or others in another district than the residence of the parents or parent primarily for school purposes, the general rule applies. Otherwise, if we are to cleave to the liberal and broad rule, which is our interpretation of the Constitution and laws passed pursuant to it.

Gladys Cline was born, and always has lived, in Denver; she has never resided with her father or in the district wherein he resides; the surrounding facts are indicative that she never will. She does not fall under the general rule of residence, but under its exception. It is urged by counsel for defendants in error that the pecuniary needs of Billy Moyers and Gladys Cline are vastly different. Of that we can have no concern. The test is residence. While boards are permitted to relax rules and waive tuition costs, courts have no jurisdiction to interpret the law one way for the well-to-do and another way for those less fortunate. See, *People v. Moore,* 240 Ill. 408, 88 N. E. 979.

The unconstitutionality of the 1939 act is urged by plaintiff in error. Considering the unquestioned physical facts of the child's residence, and the good faith of those immediately concerned in her welfare, not questioned, we cannot conceive that the General Assembly would, or did, authorize the school authorities to exclude her from the public schools of the district of *her* residence. Reasonably construed, the act contemplates two major objectives, both of which we think are salutary, namely, broader powers to school boards in affording educational facilities to deserving and needy children in any district, and to prevent parents, resorting to subterfuge—not hinted here—from burdening school districts other than

their own with the education of their children. We are convinced that plaintiff in error is a resident of Denver, and may neither be excluded from its schools nor made to suffer exaction of tuition, perforce whereof the act is without application.

The residence of Gladys Cline for school purposes is at the home of her aunt and uncle in Denver, and she must be permitted to attend the public schools therein tuition free, for, paraphrasing the language used in the Billy Moyers case: Her home is there; that, save in a certain technical sense, she has no other, and hence that her residence or domicile for school purposes is there.

That the trial court may enter decretal orders in harmony with this opinion, let the judgment be reversed.

Mr. Justice Knous, Mr. Justice Jackson and Mr. Justice Goudy dissent.

Mr. Justice Jackson dissenting.

This is an important case. It affects the conduct and procedure of the school boards of some two thousand school districts in Colorado. It arises on the question as to whether Gladys Cline shall be allowed to attend the Denver schools tuition free or pay ninety-five dollars tuition because of the fact that her father is a nonresident of the Denver school district.

It is apparent from reading the majority opinion that *Fangman v. Moyers,* 90 Colo. 308, 8 P. (2d) 762, is regarded as controlling. It therefore demands our study. In that case, as in the instant case, the minor was without a mother's care or companionship and was living in a school district different from the one in which the father was living. A dissimilarity between the two cases appears in respect to the homes. In the Moyers case Billy was placed in the Swift home to become a member of the Swift family and be treated exactly as the Swift children. The father pays at least for some of the ex-

penses at the Swift home and Billy himself takes care of part of the cost of his upkeep by working. His father meanwhile lives in a town in another school district, where he rents a room, takes his meals at various restaurants, and begins the practice of law. In the instant case we find the minor living in the commodious home of her maternal aunt, with whom she has always lived —a home maintained by the comfortable earnings or income of her uncle-in-law. The home of her father in a neighboring school district is sustained by his comfortable income. It becomes immediately apparent that the minor in the instant case has two homes available— those of her father and of her maternal aunt—and that if one home through a set of unfortunate circumstances should become unavailable she has recourse to the other. *Fangman v. Moyers, supra,* affirmed the judgment of the lower court, as Mr. Justice Burke states, "on the fact, which we think fully supported by the record, that his home is there [with the Swift family]; that, save in a certain technical sense, he has no other, and hence that his residence or domicile for school purposes is there."

The facts in the Moyers case raise an implication that Billy was allowed to attend school in the district where he was actually living because of the stern fact that if he was not allowed to attend school in that district he would get no schooling at all. There appeared to have been untoward and hard circumstances in the Moyers case, supra, that do not exist in the instant case.

The opinion in *Fangman v. Moyers, supra,* is based on four cases: *McNish v. State ex rel.,* 74 Neb. 261, 104 N. W. 186, 12 Ann. Cas. 896; *State v. Thayer,* 74 Wis. 48, 41 N. W. 1014; *State ex rel. v. Board of Education,* 96 Wis. 95, 71 N. W. 123; *State ex rel. v. Selleck,* 76 Neb. 747, 107 N. W. 1022. From the first one, namely: *McNish v. State ex rel.,* the court quotes at length with approval. The opinion in that case shows that the father of the minor involved was in straitened financial circumstances

and had given complete control of his minor child to a cousin of the child's deceased mother. This cousin in charge was deemed to have stood in loco parentis. In the second case, *State v. Thayer,* the mother of the child was deserted by the husband and had no home but boarded in a city where she taught school and where she was unable to keep her son. She located a home for him in another school district where he worked for his board, having no other home. Mr. Justice Burke quotes with approval Superintendent Thayer's statement quoted in that case: " 'In the incidents of human life families are broken up and must be scattered, by the necessities of obtaining a livelihood, by death of one or both parties, or by abandonment of offspring, as in this case. Such children, as all others, are the wards of the state, to the extent of providing for their education to that degree that they can care for themselves and act the part of intelligent citizens. * * * ' " In the third case, *State ex rel. v. Board of Education,* the school child had been apprenticed to and had been living with a resident of the school district who had furnished his apprentice with the necessary school books, utensils and apparatus. *The three foregoing cases all contain facts showing such circumstances that if the child were not allowed to attend school where it was at that time living it would have no schooling at all.* The fourth case, *State ex rel. v. Selleck,* has facts not similar to the instant case or to the other cases mentioned above. There the Nebraska Supreme Court held that the children of the Governor and the State Superintendent of Schools could attend schools in Lincoln free of tuition, even though the legal residence of both officials was elsewhere, because their official duties compelled them to be in Lincoln and it was against public policy to separate parents from their children. This case is like *Cavanagh v. Ballou, Supt.,* 36 Fed. Supp. 445. The latter case construes an act of Congress which, recognizing the peculiar situation existing in the District of Columbia, affirmatively pro-

vided that children of employees of the federal government residing in the district should be entitled to free schooling within the district and not be charged tuition as children of nonresidents. The latter case along with *State ex rel. v. Selleck, supra,* it will be noted, *is grounded on the principle of administering the school law so as to allow a child to live with its parent or parents.*

It may be interesting to study other cases of this type that have arisen in the last thirty-five or forty years. In some of the following cases free schooling has been denied. In other cases, by the application of a more liberal construction, free schooling has been granted. These cases are cited, not to show which disposition was made, but to demonstrate in each case the situation of the particular school child involved: Children residing in a home for dependent and neglected minors and orphans, *State ex rel. v. School Board,* 206 Minn. 63, 287 N.W. 625; minor 16 years old was emancipated by his father and left to go on his own, *Kidd v. Joint School District,* 194 Wis. 353, 216 N.W. 499; a ward of the state committed to the State Board of Children's Guardians, *Shaw, Atty. Genl., ex rel. v. Small,* 124 Me. [1924] 36, 125 Atl. 496; minor placed in a child welfare home, *Child Welfare Society of Flint v. Kennedy School Dist.,* 220 Mich. 290, 189 N.W. 1002; a home for the care and support of orphans of deceased membership of I.O.O.F., *Grand Lodge I.O.O.F. v. Board of Education,* 90 W. Va. 8, 110 S.E. 440, 48 A.L.R. 1092; minor whose mother died and whose father had told her she must make her own living or leave home. She thereafter lived with an older, married sister, who aided her in supporting herself, the father contributing nothing and surrendering control of the daughter to older sister, *Martins v. School District,* 101 Neb. 258, 162 N.W. 631. Children living in the Bethesda Children's Home, *State ex rel. v. Cotton,* 67 S. D. 63, 289 N.W. 71; inmates of orphans' home, *Crain v. Walker,* 222 Ky. 828, 2 S.W. (2d) 654; boarding house

20

for children—lack of financial resources and work prevented parents from maintaining home for infants, *Horowitz v. Board of Education,* 216 N.Y.S. 646, 217 App. Div. 233; inmates of orphans' home, *Ashley v. Board of Education,* 275 Ill. 274, 114 N.E. 20; inmates of orphanage, *Dorothy Logsdon v. W. F. Jones,* 311 Ill. 425, 143 N.E. 56; mother of two boys was dead, their father resided in Canada, had emancipated them, and an uncle in Iowa was made their guardian, *Mt. Hope School Dist. v. Hendrickson,* 197 Ia. [1924] 191, 197 N.W. 47; two orphans who reside with relatives who support and control them, one orphan who resides with a stranger who supports and controls him, a child whose father lives in Norway who lives with an aunt who brought her to this country and has control over her, a child whose mother is dead and whose father has not resided in state for eight years lives with relative who controls her, *Public Schools v. Wright,* 176 Mich. 6, 141 N.W. 866; inmate of charitable institution, *School Dist. v. Pittsburgh School Dist.,* 77 Pa. Super. Ct. 75; child whose father, upon the mother's death, having no home or means of securing one, gives the child up to its sister, who was to have full charge of it and give it a home, *Board of Trustees v. Powell,* 145 Ky. 93, 140 S.W. 67, 36 L.R.A. (N.S.) 341, Ann. Cas. 1913B 1016; children committed to a private corporation chartered for their support and education, *Lake Farm v. District Board,* 179 Mich. 171, 146 N.W. 115, 51 L.R.A. (N.S.) 234; orphan child cared for by Childrens' Aid Society, *People ex rel. v. Hendrickson,* 109 N.Y.S. 403—order affirmed 196 N.Y. 551, 90 N.E. 1163; dependent children committed to the care of certain persons pursuant to juvenile act 1903, *Black v. Graham,* 238 Pa. 381, 86 Atl. 266, 44 L.R.A. (N.S.) 693; children of occupants of land under federal farmstead project, parents having been selected from relief rolls, *Tagge v. Gulzow, et al.,* 132 Neb. [1937] 276, 271 N.W. 803; *Rolland v. School Dist.,* 132 Neb. 281, 271 N.W. 805.

It may be significant that counsel for plaintiff in error

apparently is forced to rely upon three of the above mentioned cases in support of his argument for a liberal interpretation of the residence qualification: *State ex rel. v. School Board, supra* (Minn.); *Grand Lodge I.O.-O.F. v. Board of Education, supra* (W.Va.); and *Martins v. School District, supra* (Neb.). This seems to corroborate the theory that this liberal rule of residence arises from the hard fact that but for such a liberal interpretation the particular minors involved would be deprived of any schooling.

Plaintiff in error's brief cites *Yale v. West Middle School District,* 59 Conn. (1890) 489, 22 Atl. 295. In that case the parents of the minor had never been within the limits of the State of Connecticut and at the time of the litigation were living in Missouri. They had agreed with Mr. and Mrs. Yale, the latter being the maternal aunt of the minor, that they should have complete control of the child until the latter was married. There was, however, no legal adoption. In that case the opinion is silent as to the circumstances which led to the leaving of the minor with the Yale family. In addition to this case cited by plaintiff in error, the following also appear to be cases where the opinion is silent as to the circumstances of the parties involved and the reason for the separation of the minor from its parent or parents. *People ex rel. v. Board of Education,* 206 Ill. App. (1917) 381; *State ex rel. v. Clymer,* 164 Mo. App. 671, 147 S.W. 1119; *Mizner v. School Dist.,* 2 Neb. Unoff. 238, 96 N.W. 128.

The remaining case cited in brief of plaintiff in error on this particular phase of the argument is *School District v. School District,* 236 Mich. 677, 211 N.W. 60. This, it will be noted, was a contest between two school districts involving the domicile, not of the child but of the father, the family remaining intact and having moved into a town school district from a country district when the father accepted employment in the light plant in town. He had been in town several years, testified that

he expected to continue to live in town as long as he was employed there and would return to the country only if he lost his employment. The court held that he was a resident of the town school district for school purposes.

In the instant case, however, it appears affirmatively from the opinion of the court, as well as the record, that the surviving parent of the minor had a comfortable home and was in as comfortable financial circumstances as the owner of the home in the neighboring school district in which the minor was living; that the father saw his daughter frequently; that he claimed her as a dependent in his income tax return; that the element of hardship was wholly lacking and that the reason the minor did not live with her father was not because it was impossible, but simply because it was not desired by the particular persons involved. But the fact that parents prefer the schools in one school district to those in an adjoining school district does not justify them in ignoring the rules regarding residence qualifications. *Logan City School Dist. v. Kowallis,* 94 Utah 342, 77 P. (2d) 348.

The law on this subject appears to have grown from the cases of those of school age who have been caught in what the poet Henley has referred to as the "fell clutch of circumstance"; and it is the fell clutch of circumstance, the sheer necessity of the situation in each particular case, that seems to have dictated the modification of the general rule that the residence of the child follows that of the parent. The foregoing recital of cases emphasizes the words of Mr. Justice Burke in *Fangman v. Moyers, supra,* "If the school residence of all minors be confined to the district of the residence of parents or guardians, the helpless inmates of charitable institutions and children abandoned by parents and given a home by others, would often be the victims of this harsh construction." The relaxing of the general rule has come about through the very fact that the school child in each

particular case would not have the schooling if the rule were not relaxed. ·

But in the instant case there is no such situation staring Gladys Cline in the face. One cannot say that if she is denied free school privileges in the Denver school district that she will have no schooling, for on the face of the record both her maternal aunt and her father are financially able to pay the school tuition of $95 if she desires to remain in Denver; and if she does not, then her father is amply capable of supporting her in his own home where school privileges are free.

It is thus seen that in a few cases an adequate picture of the situation surrounding the school child or its family is not shown, but after examination of the cases on this subject appearing in the digests it seems to be a fair statement that this is the first case where, in the court's written opinion, it appears affirmatively that the school child has available two homes, both of them of comfortable circumstances, where the nonresident parent himself is definitely shown to be in comfortable financial circumstances, living only a few miles away, and still claiming his daughter as his dependent, and where the child is held to have a residence separate from that of her father. This case therefore becomes a maverick in the group of cases on this subject.

The trial court was of the opinion that the instant case was distinguishable from *Fangman v. Moyers, supra.* I too am strongly of the opinion that the instant case is not supported by *Fangman v. Moyers, supra.* I am further of the opinion that it is not supported either by the cases that in turn support *Fangman v. Moyers, supra,* or by the great majority of other cases on the subject involved. In fact, there seems to be no case that squarely supports it.

### 1933-1939 Acts.

*Fangman v. Moyers, supra,* was announced February 23, 1932, and this decision interpreted the various sec-

tions of the school law in force at that time, to wit: section 8346, C.L. '21, as amended by chapter 157, S.L. '27, providing for the taking of a school census and for its correction by the county superintendent of schools, and sections 8280 and 8283 for the apportionment of school funds based thereon.

A year later (in 1933) the legislature amended section 8496, C.L. '21 (chapter 163, S.L. '33). Previously section 8496 had consisted simply of one paragraph. A whole new second paragraph was added, beginning: "A child shall be deemed to reside in a school district if: (1) both his parents reside, or the survivor of them, or the one of them to whom custody of such child shall have been awarded by any court of competent jurisdiction, resides in the school district; (2) the legally appointed guardian of his person resides in the school district, provided that the court appointing such guardian shall certify that the primary purpose of such appointment is not to qualify such child as a resident of that school district; (3) after emancipation by his parents, or the survivor thereof, from their or his control, and he has no guardian, he lives within the school district; (4) in the judgment of the Board of Education of the school district wherein the child lives, the child has been abandoned by his parents; (5) the child has become permanently dependent for his maintenance and support on someone other than his nonresident parents, or upon any charitable organization; provided said dependent child is actually to make his home and receive his support within the school district where he desires to attend; (6) if one of the child's parents or the guardian of his person is a public officer, or employee, living temporarily for the performance of his duties in a school district other than that of his residence. * * * "

The majority of the court now takes the position that the legislature in 1933, although having the case of *Fangman v. Moyers, supra,* in mind, did not intend to legislate for such a situation as is disclosed in the instant

case; in other words, that the act of 1933 is inapplicable to the instant case. It is my opinion that the legislature definitely intended to cover the whole field of residence of school children. Not only does the act closely follow in time *Fangman v. Moyers, supra,* it having been adopted at the first session of the legislature after the decision in that case had been rendered, but the six divisions of the amending paragraph of the 1933 act relate to the very cases and situations set forth in the supporting cases cited by Mr. Justice Burke in *Fangman v. Moyers, supra:* sections 1 and 2 state the general law of residence in the absence of statute; section 3 relates to the case of the emancipated child, *State ex rel. v. Board of Education, supra* (Wis.); section 4 is the case of the abandoned child referred to by Superintendent Thayer in *State v. Thayer, supra;* section 5 is the case of a child who has become permanently dependent on someone other than its nonresident parent and is illustrated by *McNish v. State ex rel. Dimick, supra;* and section 6 is where the child's parent was a public officer or employee living temporarily for the performance of his duties in a school district other than that of his residence, *State ex rel. v. Selleck, supra.* This 1933 amendment expressly did not repeal sections 8335 and 8337 of the Compiled Laws of 1921. Considering the time element and the very subject matter of the act itself, the conclusion is inescapable that the legislature not only knew about *Fangman v. Moyers, supra,* as the majority admits in the opinion, but had given it thorough study, and that the act was passed in response to it and in effect gave expression to and codified the cases therein cited and was intended to cover the whole field of dealing with the question of which school district should furnish free education to a school child. Here is the legislative version in respect to the proper school district in which a child is entitled to free education, after taking into consideration the very cases of hardship referred to in *Fangman v. Moyers, supra.*

But even with the modifications of the general law of residence embodied in the 1933 act, the legislature apparently realized that there might still be other cases of hardship not provided for therein and so, in 1939, it passed the following (S.L. '39, c. 152): "Section 1. Every board of education shall have the power to exclude from the schools of the district under its control, or to fix the terms of admission for, a pupil whose parent or parents reside in some other school district if in the judgment of the board of education the pupil does not need to be in the school district in order to have a home and the necessities of life. However, if (in) the judgment of the board of education the pupil needs to be in the school district in order to have a home and the necessities of life, the board of education is hereby authorized to waive all tuition costs." This 1939 act takes care of cases where hardship might arise under subdivision (1) of the 1933 act, and empowers the school board in its discretion to admit certain children of nonresident parents tuition free.

This 1939 act removes any possible ambiguity arising from the meaning of residence of the pupil, or what constitutes residence of the pupil, by dealing solely and directly with *a pupil whose parent or parents reside in some other school district.* The question in the instant case is therefore not in what school district does Gladys Cline have her residence for school purposes, which was the question in *Fangman v. Moyers, supra,* and which the majority opinion states is the question in the instant case. The two facts to be determined under the 1939 act are: first, is she a pupil of the Denver school district? and second, does her parent reside in some other school district? In the instant case both questions must be answered in the affirmative. Her case clearly, therefore, comes within the purview of the 1939 act, and the Denver school district has clear authority to deal with her case as its judgment shall dictate. The 1939 act disposes completely of any question of the residence of the pupil

and sets up a new test: that of whether the parent resides in a different school district from that where the pupil is attending school.

Apparently disapproving the action of the Denver school board in refusing Gladys Cline free tuition in the Denver school district, the majority of this court in their opinion state: "We cannot conceive that the general assembly would or did authorize the school authorities to exclude her from the public schools of the district of *her* residence." But by the express provisions of the act of 1939 the school board is given the power to exclude *a pupil whose parent or parents reside in some other school district.* No exception is made in respect to any pupil, or any parent of such pupil. As was said in *Cree v. Becker,* 49 Colo. 268, 112 Pac. 783, about another statute: "Its terms are plain, clear and direct. It evidently means just what it says, and says just what it means, and needs no construction. * * * the statute indicates no such exception and none such should be read into it." Or, as Mr. Justice Burke said in *Lowdermilk v. People,* 70 Colo. 459, 202 Pac. 118, construing another law, "the meaning of the act is unmistakable and no microscopic distinctions are to be drawn to nullify it."

There is an implication that such a statute is against public policy. As was said by Williams, J., in *Inhabitants of St. Gregory,* 29 English Common Law Reports, Adolph & Ellis, 65, at page 68: "The ground of public policy is a very unsafe one: it is best to adhere to the words used in the act of parliament." In the same connection Dwarris on Statutes, page 215, quotes another English judge, Burrough, as stating that deciding upon the policy of an act was "riding an unruly horse." "Arguments," says Story, "drawn from impolicy or inconvenience, ought to have little weight. The only sound principle is to declare ita lex scripta est, to follow and to obey." Story's "Conflict of Laws," page 17. See, Potter's Dwarris on Statutes and Constitutions, p. 215.

If Gladys Cline does not come under the 1939 act, then

it can be said neither does any other pupil whose parent or parents reside in some other school district.

In the majority opinion, stress is laid on the fact that the title of the 1939 act reads "Schools. Nonresident Pupils. An Act Relating to the School Attendance of Nonresident Pupils." Is is submitted that the expression "nonresident pupils" in the title of the act means those pupils whose parent or parents reside in some other school district. One reason is because the body of the act is then consistent with the title of the act; otherwise, there would be a variance between the title of the act and the body of the act which would render the act invalid. A rule of statutory construction is that, in the event of ambiguity, an act should be so construed as to uphold its validity rather than to be construed so as to cause it to fail. Another reason is that such a meaning is the commonly accepted one, i.e.: the residence of minors is ordinarily determined by the residence of their parents and has hitherto been so used by the legislature, rather than the special meaning used in *Fangman v. Moyers, supra*.

Another reason why I dissent from the majority opinion is because the effect of the majority opinion is to say that under *Fangman v. Moyers, supra,* a child, who would be a nonresident under the 1933 and 1939 acts, is in effect a resident, and then with the question already begged as to the residence of the child, any further legislation becomes inapplicable. The effect is to close the door to any future legislation on this subject. This is judicial legislation with a vengeance.

And finally, the effect of this decision is to take from the legislature and school boards the solution of these numerous cases of residence and throw them into the courts with no clear standard as a guide.

### Conclusion.

From the foregoing it is apparent that I dissent from the majority opinion of the court for four reasons: First,

because this case does not come under *Fangman v. Moyers, supra,* or its supporting cases; second, because I believe that the 1933 and 1939 acts of the state legislature, both enacted subsequent to the decision in the *Fangman-Moyers* case, are applicable; third, because the opinion is so written that it in effect holds that any law that the legislature in the future might care to enact modifying the effect of the opinion in the *Fangman-Moyers* case would be inapplicable; and, fourth, because the effect of the decision is to throw the law in regard to residence of school children into a chaos of uncertainty.

MR. JUSTICE KNOUS AND MR. JUSTICE GOUDY join in this dissenting opinion.