In the Matter of WILLIAM BALDWIN, an Alleged Incompetent, by MARY L. BALDWIN, His Guardian ad Litem, against WILLIAM J. TIFFANY, Superintendent of Kings Park State Hospital, et al., Respondents.

490

(Argued March 18, 1929; decided April 16, 1929.)

*Warren I. Lee* and *L. Hyler Connell* for appellant. The petitioner-appellant here was a resident of the State of New York at the time the order of the Supreme Court was made and was entitled to hospitalization under the provisions of the Mental Hygiene Law of this State. (*Pannell* v. *Roanoke Times Co.*, 252 Fed. Rep. 910.) Even though petitioner-appellant should not be entitled to hospitalization in this State as a resident, as respondents contend, he is entitled to hospitalization under section 60 of the Mental Hygiene Law. (*Bassett* v. *Wheeler*, 84 N. Y. 466; *Matter of Honeyman*, 117 Misc. Rep. 653; *People ex rel. Rausch* v. *Rausch*, 193 N. Y. Supp. 235; *Kennedy* v. *Ryall*, 67 N. Y. 379; *Silvey* v. *Lindsay*, 107 N. Y. 55; *Matter of Curtiss*, 199 N. Y. 36.)

*Hamilton Ward*, Attorney-General (*George W. Davis* and *Borden H. Mills* of counsel), for respondents. The petitioner-appellant herein was not a resident of the State

of New York and was not entitled to hospitalization under the provisions of the Mental Hygiene Law of this State. (Cons. Laws, ch. 27, § 2, subd. 7.)

POUND, J. The State hospitals are for the care and treatment of the poor and indigent insane of the State. Care and treatment in a State hospital is limited to residents of this State, except in the case of persons whose residence cannot be determined or who, for humane reasons, are received pending their acceptance by the State or country in which they have a legal residence. (Mental Hygiene Law [L. 1927, ch. 426; Cons. Laws, ch. 27], § 60.)

Prior to March 6, 1929, when the word " continuously " was inserted in the definition by chapter 63 of the Laws of 1929, it was provided that:

" ' Resident ' means a person who shall have lived in this State at least one year, exclusive of the time spent in public or private institutions." (Mental Hygiene Law, § 2, subd. 7.)

The transfer of patients who have not obtained a legal settlement in this State is provided for by section 87 of the Mental Hygiene Law as follows:

" If an order be issued by any judge, committing to a state hospital a poor or indigent person, who has not acquired a legal settlement in this state, the commissioner [of mental hygiene] shall return such insane person, either before or after his admission to a state hospital, to the country or state to which he belongs, and for such purpose may expend so much of the money appropriated for the care of the insane as may be necessary, subject to the audit of the comptroller."

William Baldwin became a resident of the State of New York in September, 1926. He was adjudged insane on April 21, 1927, when he was 23 years of age, and was committed to the Kings Park State Hospital, a State hospital for the insane. Thereafter, the Commissioner

of Mental Hygiene returned him to the State of Georgia, on the ground that he belonged to that State. In July, 1927, Baldwin returned to the State of New York. On December 19, 1927, he was again adjudged insane and committed to the State hospital. On January 18, 1928, he was again returned to Georgia. On or about March 15, 1928, he again returned to the State of New York. On March 30, 1928, he was for the third time adjudged insane and committed to the Central Islip State Hospital. On the threat of the State authorities that he would be again returned to Georgia, his mother placed him temporarily, on April 9, 1928, in the Long Island Home, a private institution at Amityville, New York, where he remained until he was received in Kings Park State Hospital under the order of the Appellate Division, pending his acceptance by the State of Georgia.

The Attorney-General concedes that Baldwin, at the time this proceeding was instituted, had lived in the State of New York, exclusive of the time spent in institutions, for fourteen months, divided into three periods of seven months, five months and two months respectively, following each of which periods he was committed to an institution for the insane.

The question is whether the incompetent is entitled to care and treatment in a State hospital for the insane as a resident of the State or as a non-resident, pending his return to Georgia, the State of which he was a resident some time before he came to New York.

As it appears that Baldwin had been living in the State for less than eight months at the time of his first commitment, he had not then gained a settlement within the meaning of the Mental Hygiene Law. He was entitled to care and treatment in a State hospital pending his acceptance by the State or country to which he belonged. His acceptance by the State of Georgia had not been arranged for and " for humane reasons " he should not have been taken to that State without previous

assurance that he would be received. Without such an arrangement, it might be expected that he would return, as he did, to his mother in New York. Again adjudged insane and committed, he was again returned to Georgia. Again he returned and again this homicidal maniac was adjudged insane and committed. Again he was threatened with deportation when this proceeding was instituted. These unseemly efforts to discharge the insane person within the limits of the State of Georgia have become a scandal and should cease. Either he should receive care and treatment as a resident of New York, as the Special Term directed, or he should receive such care and treatment as a non-resident pending his acceptance by the State of Georgia, as the Appellate Division ordered. It is fair to say that such was the position taken on the argument by the Attorney-General.

The word " reside " is capable of different meanings. We are dealing here with a statutory definition. The insane person, to gain a legal settlement, must have lived in the State at least one year, exclusive of the time spent in public or private institutions. We are dealing with the care and treatment of the poor and indigent insane. The purpose of the statute is to prevent the State from becoming the dumping ground of non-resident pauper insane. With this object in view, the statute requires a reasonable interpretation to give it practical effect and to guard against abuse.

When Baldwin came to Brooklyn in 1926 he did not gain a settlement in New York. He initiated a residence which might ripen into a settlement if he lived here for a year. When he was forced to leave the State by the Commissioner of Public Hygiene, he had no intention of giving up his residence in New York. It remained his residence until he should manifest a contrary purpose by an actual change of residence with the intention of remaining permanently away. (*Dupuy* v. *Wurtz,* 53 N. Y. 556; *People* v. *Platt,* 117 N. Y. 159; *deMeli* v. *deMeli,*

120 N. Y. 485.) He did not cease to be a resident of New York when under compulsion he left the State.

True it is that the incompetent did not subsist in New York when he was without its boundaries. Clear it is that he had no home or fixed place of abode in New York at the time when he was taken out of the State. Yet, within the letter of the statute, he had lived in New York for one year before his third commitment.

He had lived in New York for a period of fourteen months, not continuous, but broken only by his enforced and involuntary absences from the State. He had acquired no residence elsewhere during such absences. He had thus gained a legal settlement in this State by living therein " at least one year, exclusive of the time spent in public or private institutions." Continuity of physical presence for one year is not required. The word " continuously " should not be written into the statute by implication in cases where nothing appears to break the continuity of voluntary residence. Otherwise a settlement might be prevented by forcibly removing any resident poor person beyond the boundaries of the State and leaving him to find his way back home.

It follows that Baldwin is entitled to care and treatment in a State hospital as a resident patient.

The order of the Appellate Division should be reversed and that of the Special Term affirmed, with costs in this court and in the Appellate Division.

CARDOZO, Ch. J., CRANE, LEHMAN, KELLOGG, O'BRIEN and HUBBS, JJ., concur.

Ordered accordingly.