MARTINEZ, AS NEXT FRIEND OF MORALES *v.* BYNUM,
TEXAS COMMISSIONER OF EDUCATION, ET AL.

No. 81–857.  Argued January 10, 1983—Decided May 2, 1983

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, BLACKMUN, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined. BRENNAN, J., filed a concurring opinion, *post*, p. 333. MARSHALL, J., filed a dissenting opinion, *post*, p. 334.

*Edward J. Tuddenham* argued the cause and filed briefs for petitioner.

*Richard L. Arnett*, Special Assistant Attorney General of Texas, argued the cause for respondents. With him on the brief were *Mark White*, Attorney General, *John W. Fainter, Jr.*, First Assistant Attorney General, *Richard E. Gray III*, Executive Assistant Attorney General, and *C. Ed Davis.**

JUSTICE POWELL delivered the opinion of the Court.

This case involves a facial challenge to the constitutionality of the Texas residency requirement governing minors who wish to attend public free schools while living apart from their parents or guardians.

I

Roberto Morales was born in 1969 in McAllen, Texas, and is thus a United States citizen by birth. His parents are Mexican citizens who reside in Reynosa, Mexico. He left Reynosa in 1977 and returned to McAllen to live with his sister, petitioner Oralia Martinez, for the primary purpose of at-

---

**Robert S. Ogden, Jr.*, and *Charles S. Sims* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging reversal.

*David Crump* filed a brief for the Texas Association of School Boards et al. as *amici curiae* urging affirmance.

tending school in the McAllen Independent School District. Although Martinez is now his custodian, she is not—and does not desire to become—his guardian.[1] As a result, Morales is not entitled to tuition-free admission to the McAllen schools. Sections 21.031(b) and (c) of the Texas Education Code would require the local school authorities to admit him if he or "his parent, guardian, or the person having lawful control of him" resided in the school district, Tex. Educ. Code Ann. §§ 21.031(b) and (c) (Supp. 1982), but § 21.031(d) denies tuition-free admission for a minor who lives apart from a "parent, guardian, or other person having lawful control of him under an order of a court" if his presence in the school district is "for the primary purpose of attending the public free schools."[2] Respondent McAllen Independent School Dis-

---

[1] Section 51.02(4) of the Texas Family Code defines "custodian" as "the adult with whom the child resides." Tex. Fam. Code Ann. § 51.02(4) (1975). "Guardian" is defined as "the person who, under court order, is the guardian of the person of the child or the public or private agency with whom the child has been placed by a court." § 51.02(3).

[2] Section 21.031 provides, in relevant part:

"(b) Every child in this state . . . who is over the age of five years and not over the age of 21 years on the first day of September of the year in which admission is sought shall be permitted to attend the public free schools of the district in which he resides or in which his parent, guardian, or the person having lawful control of him resides at the time he applies for admission.

"(c) The board of trustees of any public free school district of this state shall admit into the public free schools of the district free of tuition all persons . . . who are over five and not over 21 years of age at the beginning of the scholastic year if such person or his parent, guardian or person having lawful control resides within the school district.

"(d) In order for a person under the age of 18 years to establish a residence for the purpose of attending the public free schools separate and apart from his parent, guardian, or other person having lawful control of him under an order of a court, it must be established that his presence in the school district is not for the primary purpose of attending the public free schools. The board of trustees shall be responsible for determining whether an applicant for admission is a resident of the school district for purposes of attending the public schools."

trict therefore denied Morales' application for admission in the fall of 1977.

In December 1977 Martinez, as next friend of Morales, and four other adult custodians of school-age children instituted the present action in the United States District Court for the Southern District of Texas against the Texas Commissioner of Education, the Texas Education Agency, four local School Districts, and various local school officials in those Districts. Plaintiffs initially alleged that § 21.031(d), both on its face and as applied by defendants, violated certain provisions of the Constitution, including the Equal Protection Clause, the Due Process Clause, and the Privileges and Immunities Clause. Plaintiffs also sought preliminary and permanent injunctive relief.

The District Court denied a preliminary injunction in August 1978. It found "that the school boards . . . have been more than liberal in finding that certain children are not living away from parents and residing in the school district for the sole purpose of attending school." App. 20a. The evidence "conclusively" showed "that children living within the school districts with someone other than their parents or legal guardians will be admitted to school if *any* reason exists for such situation other than that of attending school only." *Ibid.* (emphasis in original).

---

Although the "special purpose" test was not codified in § 21.031(d) until 1977, it had been a feature of Texas common law since at least 1905. See, *e. g., De Leon* v. *Harlingen Consolidated Independent School District*, 552 S. W. 2d 922, 924–925 (Tex. Civ. App. 1977); Tex. Atty. Gen. Op. No. H–63, pp. 2–3 (July 12, 1973); Tex. Atty. Gen. Op. No. O–586, pp. 3–4 (May 25, 1939); 1906–1908 Tex. Atty. Gen. Op. 245, 248 (1905). Before 1905, courts in several States had ruled that a child could not acquire residence for school purposes if his presence in the school district was for the sole purpose of attending school. See, *e. g., Yale* v. *West Middle School District*, 59 Conn. 489, 491, 22 A. 295, 296 (1890); *State ex rel. School District Board* v. *Thayer*, 74 Wis. 48, 58–59, 41 N. W. 1014, 1017 (1889); *Wheeler* v. *Burrow*, 18 Ind. 14, 17 (1862); *School District No. 1* v. *Bragdon*, 23 N. H. 507, 510, 516 (1851).

Plaintiffs subsequently amended the complaint to narrow their claims. They now seek only "a declaration that . . . § 21.031(d) is unconstitutional on its face," *id.*, at 3a, an injunction prohibiting defendants from denying the children admission to school pursuant to § 21.031(d), restitution of certain tuition payments,[3] costs, and attorney's fees. App. 3a, 7a. After a hearing on the merits, the District Court granted judgment for the defendants. *Arredondo* v. *Brockette*, 482 F. Supp. 212 (1979). The court concluded that § 21.031(d) was justified by the State's "legitimate interest in protecting and preserving the quality of its educational system and the right of its own bona fide residents to attend state schools on a preferred tuition basis." 482 F. Supp., at 222. In an appeal by two plaintiffs, the United States Court of Appeals for the Fifth Circuit affirmed. 648 F. 2d 425 (1981). In view of the importance of the issue,[4] we granted certiorari. 457 U. S. 1131 (1982). We now affirm.

## II

This Court frequently has considered constitutional challenges to residence requirements. On several occasions the Court has invalidated requirements that condition receipt of a benefit on a minimum period of residence within a jurisdiction, but it always has been careful to distinguish such durational residence requirements from bona fide residence requirements. In *Shapiro* v. *Thompson*, 394 U. S. 618 (1969), for example, the Court invalidated one-year durational residence requirements that applicants for public assistance

---

[3] Morales attended school in the McAllen School District during the fall, 1978 semester when Texas Rural Legal Aid, Inc., paid his tuition. Bond has been posted to cover subsequent tuition payments.

[4] The vast majority of the States have some residence requirements governing entitlement to tuition-free public schooling. Many States have statutes substantially similar to § 21.031(d). See, *e. g.*, Ind. Code § 20–8.1–6.1–1(c) (1982); Me. Rev. Stat. Ann., Tit. 20, § 859(3)(B)(2) (Supp. 1982); Mass. Gen. Laws Ann., ch. 76, § 6 (West 1982); Mich. Comp. Laws § 380.1148 (Supp. 1981); Ore. Rev. Stat. § 332.595(5) (1981).

benefits were required to satisfy despite the fact that they otherwise had "met the test for residence in their jurisdictions," *id.*, at 627. JUSTICE BRENNAN, writing for the Court, stressed that "[t]he residence requirement and the one-year waiting-period requirement are distinct and independent prerequisites for assistance," *id.*, at 636, and carefully "impl[ied] no view of the validity of waiting-period *or* residence requirements determining eligibility to vote, eligibility for tuition-free education, to obtain a license to practice a profession, to hunt or fish, and so forth," *id.*, at 638, n. 21. In *Dunn* v. *Blumstein,* 405 U. S. 330 (1972), the Court similarly invalidated Tennessee laws requiring a prospective voter to have been a state resident for one year and a county resident for three months, but it explicitly distinguished these durational residence requirements from bona fide residence requirements, *id.*, at 334, 337, n. 7, 338, 343, 350, n. 20, 351–352. This was not an empty distinction. JUSTICE MARSHALL, writing for the Court, again emphasized that "States have the power to require that voters be bona fide residents of the relevant political subdivision." *Id.*, at 343. See also *Memorial Hospital* v. *Maricopa County*, 415 U. S. 250, 255, 267 (1974) (invalidating one-year durational residence requirement before an applicant became eligible for public medical assistance, but recognizing validity of appropriately defined and uniformly applied bona fide residence requirements).[5]

We specifically have approved bona fide residence requirements in the field of public education. The Connecticut statute before us in *Vlandis* v. *Kline*, 412 U. S. 441 (1973), for example, was unconstitutional because it created an irrebuttable presumption of nonresidency for state university students whose legal addresses were outside of the State before

---

[5] In *McCarthy* v. *Philadelphia Civil Service Comm'n*, 424 U. S. 645 (1976) *(per curiam)*, the Court upheld a bona fide continuing-residence requirement. Again, we carefully distinguished this from a durational residence requirement. *Id.*, at 646–647.

they applied for admission. The statute violated the Due Process Clause because it in effect classified some bona fide state residents as nonresidents for tuition purposes. But we "fully recognize[d] that a State has a legitimate interest in protecting and preserving . . . the right of its own bona fide residents to attend [its colleges and universities] on a preferential tuition basis." *Id.*, at 452–453. This "legitimate interest" permits a "State [to] establish such reasonable criteria for in-state status as to make virtually certain that students who are not, in fact, bona fide residents of the State, but who have come there solely for educational purposes, cannot take advantage of the in-state rates." *Id.*, at 453–454.[6] Last Term, in *Plyler* v. *Doe*, 457 U. S. 202 (1982), we reviewed an aspect of Tex. Educ. Code Ann.

---

[6] Two years before *Vlandis*, the Court upheld a domicile requirement for resident tuition rates at the University of Minnesota. *Starns* v. *Malkerson*, 401 U. S. 985 (1971), summarily aff'g 326 F. Supp. 234 (Minn. 1970) (three-judge court). The governing regulations declared: "No student is eligible for resident classification in the University . . . unless he has been a bona fide domiciliary of the state for at least a year immediately prior thereto. . . . For University purposes, a student does not acquire a domicile in Minnesota until he has been here for at least a year primarily as a permanent resident and not merely as a student; this involves the probability of his remaining in Minnesota beyond his completion of school." 326 F. Supp., at 235–236.

Shortly after *Vlandis*, we upheld a domicile requirement for resident tuition rates at the University of Washington. *Sturgis* v. *Washington*, 414 U. S. 1057, summarily aff'g 368 F. Supp. 38 (WD Wash. 1973) (three-judge court). The relevant statute declared: "The term 'resident student' shall mean a student who has had a domicile in the state of Washington for . . . one year . . . and has in fact established a bona fide domicile in this state for other than educational purposes. . . ." 368 F. Supp., at 39, n. 1. "Domicile" was defined as "a person's true, fixed and permanent home and place of habitation. It is the place where he intends to remain, and to which he expects to return when he leaves without intending to establish a new domicile elsewhere." *Ibid.*

In *Memorial Hospital* v. *Maricopa County*, 415 U. S. 250 (1974), we recognized that a one-year residence requirement was consistent with *Shapiro* v. *Thompson*, 394 U. S. 618 (1969), and *Dunn* v. *Blumstein*, 405 U. S. 330

§ 21.031—the statute at issue in this case. Although we invalidated the portion of the statute that excluded undocumented alien children from the public free schools, we recognized the school districts' right "to apply . . . established criteria for determining residence." *Id.*, at 229, n. 22. See *id.*, at 240, n. 4 (POWELL, J., concurring) ("Of course a school district may require that illegal alien children, like any other children, actually reside in the school district before admitting them to the schools. A requirement of *de facto* residency, uniformly applied, would not violate any principle of equal protection").

A bona fide residence requirement, appropriately defined and uniformly applied, furthers the substantial state interest in assuring that services provided for its residents are enjoyed only by residents. Such a requirement with respect to attendance in public free schools does not violate the Equal Protection Clause of the Fourteenth Amendment.[7] It does not burden or penalize the constitutional right of interstate travel,[8] for any person is free to move to a State and to es-

_____

(1972), in the context of higher education—despite its durational aspect. 415 U. S., at 259–260, and nn. 12 and 15.

[7] A bona fide residence requirement implicates no "suspect" classification, and therefore is not subject to strict scrutiny. Indeed, there is nothing invidiously discriminatory about a bona fide residence requirement if it is uniformly applied. Thus the question is simply whether there is a rational basis for it.

This view assumes, of course, that the "service" that the State would deny to nonresidents is not a fundamental right protected by the Constitution. A State, for example, may not refuse to provide counsel to an indigent nonresident defendant at a criminal trial where a deprivation of liberty occurs. See *Argersinger* v. *Hamlin*, 407 U. S. 25 (1972). As we previously have recognized, however, "[p]ublic education is not a 'right' granted to individuals by the Constitution." *Plyler* v. *Doe*, 457 U. S. 202, 221 (1982) (citing *San Antonio Independent School District* v. *Rodriguez*, 411 U. S. 1, 35 (1973)).

[8] The courts below construed § 21.031(d) to apply to children entering a Texas school district not only from other States or countries, but also from other school districts within Texas. 648 F. 2d, at 428; 482 F. Supp., at 222. Thus there are applications of the statute that do not even involve interstate travel, let alone burden or penalize it.

tablish residence there. A bona fide residence requirement simply requires that the person *does* establish residence before demanding the services that are restricted to residents.

There is a further, independent justification for local residence requirements in the public-school context. As we explained in *Milliken* v. *Bradley*, 418 U. S. 717 (1974):

> "No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process. . . . [L]ocal control over the educational process affords citizens an opportunity to participate in decision-making, permits the structuring of school programs to fit local needs, and encourages 'experimentation, innovation, and a healthy competition for educational excellence.'" *Id.*, at 741–742 (quoting *San Antonio Independent School District* v. *Rodriguez*, 411 U. S. 1, 50 (1973)).

The provision of primary and secondary education, of course, is one of the most important functions of local government. Absent residence requirements, there can be little doubt that the proper planning and operation of the schools would suffer significantly.[9] The State thus has a substantial interest in

---

[9] The Court of Appeals accepted the District Court's findings on the adverse impact that invalidating § 21.031(d) would have on the quality of education in Texas. 648 F. 2d, at 428–429. The District Court explicitly found:

"28. Declaring the statute unconstitutional would cause substantial numbers of int[er]-district transfers, which would . . . cause school populations to fluctuate. . . .

"29. Fluctuating school populations would make it impossible to predict enrollment figures—even on a semester-by-semester basis, causing over-or-under-estimates on teachers, supplies, materials, etc.

"30. The increased enrollment of students would cause overcrowded classrooms and related facilities; over-large teacher-pupil ratios; expansion of bilingual programs; the purchase of books, equipment, supplies and

imposing bona fide residence requirements to maintain the quality of local public schools.

## III

The central question we must decide here is whether § 21.031(d) is a bona fide residence requirement.[10]   Although the meaning may vary according to context, "residence" generally requires both physical presence and an intention to remain.[11]   As the Supreme Court of Maine explained over a century ago:

other customary items of support; all of which would require a substantial increase in the budget of the school districts."   482 F. Supp., at 215.

We do not suggest that findings of this degree of specificity are necessary in every case.   But they do illustrate the problems that prompt States to adopt regulations such as § 21.031.

[10] We need not decide whether § 21.031(d) is unconstitutional as applied, for plaintiffs limited their complaint to a facial challenge of this statute. See *supra,* at 325.

We reject the argument that § 21.031(d) violates the Due Process Clause because it creates an irrebuttable presumption of nonresidence.   Brief for Petitioner 46–49; see *Vlandis* v. *Kline,* 412 U. S. 441, 446 (1973).   Morales easily could rebut any "presumption" of nonresidence if he were, in fact, a resident.   See *infra,* at 332, and n. 15; App. 20a.

We also find no merit to the argument that § 21.031(d) constitutes an impermissible burden on children who choose to adopt a nontraditional family-living arrangement.   Brief for Petitioner 23–24; see *Moore* v. *East Cleveland,* 431 U. S. 494, 506 (1977) (plurality opinion).   Unlike the housing ordinance we invalidated in *Moore* v. *East Cleveland,* the statute before us imposes residence requirements that are justified by substantial state interests on children who live apart from their parents, § 21.031(d), and on children who live with their parents, §§ 21.031(b) and (c); see *Mills* v. *Bartlett,* 377 S. W. 2d 636, 637 (Tex. 1964); *Snyder* v. *Pitts,* 150 Tex. 407, 412–417, 241 S. W. 2d 136, 139–141 (1951); *Whitney* v. *State,* 472 S. W. 2d 524, 525–526 (Tex. Crim. App. 1971); *Harrison* v. *Chesshir,* 316 S. W. 2d 909, 915 (Tex. Civ. App. 1958), rev'd on other grounds, 159 Tex. 359, 320 S. W. 2d 814 (1959) *(per curiam); Prince* v. *Inman,* 280 S. W. 2d 779, 782 (Tex. Civ. App. 1955).

[11] Contrary to the suggestion in the dissent, *post,* at 337–341, we have said nothing about domicile.   The Texas statute, like many similar ones, speaks only in terms of residence.   We hold simply that a State may impose bona

"When . . . a person voluntarily takes up his abode in a given place, with intention to remain permanently, or for an indefinite period of time; or, to speak more accurately, when a person takes up his abode in a given place, without any present intention to remove therefrom, such place of abode becomes his residence. . . ." *Inhabitants of Warren* v. *Inhabitants of Thomaston*, 43 Me. 406, 418 (1857).

This classic two-part definition of residence has been recognized as a minimum standard in a wide range of contexts time and time again.[12]

In *Vlandis* v. *Kline*, we approved a more rigorous domicile test as a "reasonable standard for determining the residential status of a student." 412 U. S., at 454. That standard was described as follows: "'In reviewing a claim of in-state status, the issue becomes essentially one of domicile. In general, the domicile of an individual is his true, fixed and permanent home and place of habitation. It is the place to which, whenever he is absent, he has the intention of returning.'" *Ibid.* (quoting Opinion of the Attorney General of the State of

---

fide residence requirements for tuition-free admission to its public schools. Our conclusion is supported by the fact that several States have recognized the "intention to remain" requirement in this context. See, *e. g.*, Conn. Gen. Stat. § 10–253(d) (Supp. 1981); Colo. Rev. Stat. § 22–1–102(2)(g) (1973); Op. No. 76–94, 1975–1976 Biennial Report of the Atty. Gen. of S. D. 660, 662 (1976); Op. No. 2825, 1969–1970 Annual Report & Official Opinions of the Atty. Gen. of S. C. 39, 40 (1970); Op. No. 59–146, 1915–1971 Ariz. Atty. Gen. Reports & Opinions 218, 220 (1959); *In re VanCurran*, 18 Ed. Dept. Rep. 523, 524 (N. Y. Comm'r Educ. 1979). Cf. n. 13, *infra*.

[12] See, *e. g.*, *Kiehne* v. *Atwood*, 93 N. M. 657, 662, 604 P. 2d 123, 128 (1979); *Bullfrog Marina, Inc.* v. *Lentz*, 28 Utah 2d 261, 269–270, 501 P. 2d 266, 272 (1972); *Estate of Schoof* v. *Schoof*, 193 Kan. 611, 614, 396 P. 2d 329, 331–332 (1964); *Hughes* v. *Illinois Public Aid Comm'n*, 2 Ill. 2d 374, 380, 118 N. E. 2d 14, 17 (1954); *Spratt* v. *Spratt*, 210 La. 370, 371, 27 So. 2d 154, 154 (1946); *Appeal of Lawrence County in re Forman*, 71 S. D. 49, 51, 21 N. W. 2d 57, 58 (1945); *Jenkins* v. *North Shore Dye House, Inc.*, 277 Mass. 440, 444, 178 N. E. 644, 646 (1931); *Thomas* v. *Warner*, 83 Md. 14, 20, 34 A. 830, 831 (1896); *Pfoutz* v. *Comford*, 36 Pa. 420, 422 (1860).

Connecticut Regarding Non-Resident Tuition, Sept. 6, 1972); cf. n. 6, *supra*. This standard could not be applied to school-age children in the same way that it was applied to college students. But at the very least, a school district generally would be justified in requiring school-age children or their parents to satisfy the traditional, basic residence criteria— *i. e.*, to live in the district with a bona fide intention of remaining there [13]—before it treated them as residents.

Section 21.031 is far more generous than this traditional standard. It compels a school district to permit a child such as Morales to attend school without paying tuition if he has a bona fide intention to remain in the school district indefinitely,[14] for he then would have a reason for being there other than his desire to attend school: his intention to make his home in the district.[15] Thus § 21.031 grants the benefits of residency to all who satisfy the traditional requirements. The statute goes further and extends these benefits to many

[13] Of course, the "intention to remain" component of the traditional residency standard does not imply an intention never to leave. Given the mobility of people and families in this country, changing a place of residence is commonplace. The standard accommodates that possibility as long as there is a bona fide present intention to remain. See n. 11, *supra*.

[14] In most cases, of course, it is the intention of the parent or guardian on behalf of the child that is relevant. See *Deterly* v. *Wells*, 53 S. W. 2d 847, 848 (Tex. Civ. App. 1932) (minor presumed to lack capacity to form requisite intention necessary to establish separate domicile). But for convenience we speak of the child's intention.

[15] Respondents have conceded that "the statute permits any child to attend school in a district in which he is present for the purpose of 'establishing a home.'" Brief for Respondents 25. But even if § 21.031(d) could be read to exclude a child who moves to a school district with the intent of making his home there when the desire to make the new home is motivated solely by the desire to attend school, Martinez does not have standing to raise such a claim. The record shows that Morales does *not* intend to make his home in McAllen: the District Court found as a fact that "Morales only intends to reside in the McAllen Independent School District until he completes his education." 482 F. Supp., at 214. He thus fails to satisfy even this most basic criterion of residence.

children even if they (or their families) do not intend to remain in the district indefinitely. As long as the child is not living in the district for the sole purpose of attending school, he satisfies the statutory test. For example, if a person comes to Texas to work for a year, his children will be eligible for tuition-free admission to the public schools. See Tr. of Oral Arg. 37. Or if a child comes to Texas for six months for health reasons, he would qualify for tuition-free education. See *id.*, at 31. In short, § 21.031 grants the benefits of residency to everyone who satisfies the traditional residence definition and to some who legitimately could be classified as nonresidents. Since there is no indication that this extension of the traditional definition has any impermissible basis, we certainly cannot say that § 21.031(d) violates the Constitution.

## IV

The Constitution permits a State to restrict eligibility for tuition-free education to its bona fide residents. We hold that § 21.031 is a bona fide residence requirement that satisfies constitutional standards. The judgment of the Court of Appeals accordingly is

*Affirmed.*

JUSTICE BRENNAN, concurring.

I join the Court's opinion. I write separately, however, to stress that this case involves only a facial challenge to the constitutionality of the Texas statute. *Ante*, at 325 and 330, n. 10. In upholding the statute, the Court does not pass on its validity as applied to children in a range of specific factual contexts. In particular, the Court does not decide whether the statute is constitutional as applied to Roberto Morales, a United States citizen whose parents are nonresident aliens. If this question were before the Court, I believe that a different set of considerations would be implicated which might affect significantly an analysis of the statute's constitutionality.

JUSTICE MARSHALL, dissenting.

Shortly after Roberto Morales reached his eighth birthday, he left his parents' home in Reynosa, Mexico, and returned to his birthplace, McAllen, Tex. He planned to make his home there with his married sister (petitioner) in order to attend school and learn English. Morales has resided with his sister in McAllen for the past five years and intends to remain with her until he has completed his schooling. The Texas statute grants free public education to every school-age child who resides in Texas except for one who lives apart from his parents or guardian for educational purposes. Accordingly, Morales has been refused free admission to the schools in the McAllen district.

The majority upholds the classification embodied in the Texas statute on the ground that it applies only to the class of children who are considered *non*residents. The majority's approach reflects a misinterpretation of the Texas statute, a misunderstanding of the concept of residence, and a misapplication of this Court's past decisions concerning the constitutionality of residence requirements. In my view, the statutory classification, which deprives some children of an education because of their motive for residing in Texas, is not adequately justified by the asserted state interests. Because I would hold the statute unconstitutional on its face under the Equal Protection Clause, I respectfully dissent.

I

At the outset it is important to make clear that the statute upheld by the Court is not the statute actually before us. Petitioner challenges the constitutionality of the classification created by the Texas statutes governing eligibility for admission to the local free schools. Under Texas law, a child who lives in the State may generally attend school where he lives. Tex. Educ. Code Ann. § 21.031(b) (Supp. 1982–1983). This is true whether the child lives with his parents or guardian, or lives apart from them under the care and control of a "cus-

todian," who is a responsible adult other than a parent or guardian to whom the child may or may not be related. Tex. Fam. Code Ann. § 51.02(4) (1975).[1] Section 21.031 creates an exception, however, for children whose "presence in the school district is . . . for the primary purpose of attending the public free schools." § 21.031(d). Those children must reside with "[a] parent, guardian, or other person having lawful control," *ibid.*, to receive free education. If they reside with a custodian, they are denied free public education.. *Ibid.*

The Court does not address the constitutionality of the classification contained in the statute. Instead, it upholds as constitutional on its face a statute that denies free public education only to a portion of the children actually described in the Texas statute: children who reside in the State solely for the purpose of attending the local schools *and* who also intend to leave the district after the completion of their education. By inferring that children will not be excluded from the local free schools if they "intend to remain indefinitely" in the district, the Court is able to characterize the Texas statute as imposing a "traditional residency standard." *Ante*, at 332, and n. 13. Having characterized the statute in this fashion, the Court then reasons that because a bona fide residence requirement has been upheld in numerous contexts, the Texas statute is *a fortiori* permissible since it does not deny free education to "resident" children, but only to nonresident children whose presence is motivated by the availability of free education. *Ante*, at 332–333.

By its terms the Texas statute applies to *any* child whose presence in the district is motivated primarily by a desire to

---

[1] Although Texas law recognizes the legal ties between a child and his custodian—for example, a custodian may consent to necessary medical treatment for the child and may act on behalf of the child in legal matters, Tex. Fam. Code Ann. §§ 35, 51–54 (1975)—a custodian is not considered an "other person having lawful control of" the child. As a result, only a child who lives in the State for other than educational purposes is permitted to attend public school when he lives with a custodian. Tex. Educ. Code Ann. § 21.031 (Supp. 1982–1983); *infra*, at 343–344.

obtain free education. The statute draws no further distinction between those who intend to leave upon the completion of their education and those who do not. No Texas court has adopted the narrowing interpretation on which this Court relies.[2] Certainly the manner in which the statute has been applied until now would not support this interpretation.[3] Moreover, the courts below never addressed the question of the constitutionality of this statute as presently interpreted by the majority. It is contrary to the settled practice of this Court to address the constitutionality of a state statute which, as newly interpreted at this late date, has never been considered by a lower court. The proper course in such a situation would be to dismiss the writ of certiorari as improvidently granted, see *The Monrosa* v. *Carbon Black Export, Inc.*, 359 U. S. 180, 183 (1959), or to remand for further

---

[2] The majority apparently recognizes that an "intent to remain" requirement is not implicit in the language of the statute. Compare *ante*, at 330, n. 10, with *ante*, at 330–331, n. 11. An individual's entry into a State for a single purpose has never been considered inconsistent with an intent to remain in the State even after the purpose is accomplished. See n. 10, *infra*. The majority cites in support of its interpretation only the Texas Attorney General's statement to this Court that § 21.031 "permits any child to attend school in a district in which he is present for the [primary] purpose of 'establishing a home.'" Brief for Respondents 25. Unlike the majority, *ante*, at 332, n. 15, I do not understand this to mean that a child who intends to remain indefinitely in the school district will be admitted to school in Texas even if his presence there is for the primary purpose of obtaining an education. I also cannot agree that "[t]he record shows that Morales does *not* intend to make his home in McAllen." *Ibid.* The *record*, which shows that Morales intends to remain in McAllen until he completes his education, is silent as to his intentions after that time. Indeed, what Morales will do in 1987 when he is graduated is most likely a matter of pure speculation even for Morales.

[3] See, *e. g.*, Plaintiffs' Exhibit 8–346 (Application of Rebecca Aguilar, Aug. 22, 1978) (Child, 15 years old, born in McAllen, living with her brother. "Rebecca attended McAllen schools prior to parent's divorce. Parents have since moved to different areas. Rebecca has done very well in school here and would like to continue attending McAllen schools"— admission denied).

proceedings. See *Toll* v. *Moreno*, 441 U. S. 458 (1979) *(per curiam)*.

The Court nevertheless proceeds to address the constitutionality of the statute as newly interpreted. For the reasons elaborated below, I believe the majority errs in its approach to that question.

## II

In the Court's view, because the Texas statute employs a "traditional" residence requirement in a uniform fashion, and indeed is even more generous since it permits some "nonresidents" to obtain free education, the statute need be subjected only to the most minimal judicial scrutiny normally accorded bona fide residence requirements. For the reasons stated below, this conclusion rests on a number of false assumptions and misconceptions. The Court mistakenly equates the Texas statute with a residence requirement, when in fact the statute, as reinterpreted by the Court, imposes a standard even more difficult to meet than a domicile requirement for access to public education. Moreover, even if it were permissible to provide free public education only to those residents who intend to remain in the State, the Texas statute does not impose that restriction uniformly.

## A

The majority errs in reasoning that, because "intent to remain indefinitely" in a State is a "traditional" component of many state residence requirements, the imposition of that restriction on free public education is presumptively valid. *Ante*, at 330–333.[4] The standard described by the Court is not

---

[4] This Court's past decisions striking down durational residence requirements demonstrate that a statutory scheme does not escape scrutiny simply because it adopts a "traditional" residence requirement as a basis for denying benefits to certain classes of people. See *Memorial Hospital* v. *Maricopa County*, 415 U. S. 250 (1974); *Dunn* v. *Blumstein*, 405 U. S. 330 (1972); *Shapiro* v. *Thompson*, 394 U. S. 618 (1969). In *Dunn* v. *Blumstein*, for example, the Court struck down Tennessee's one-year durational residence requirement for voting in state elections, even though such

the traditional standard for determining residence, but is, if anything, the standard for determining domicile. Although this Court's prior cases suggest that, as a general matter, a State may reserve its educational resources for its residents, there is no support for the view that a State may close its schools to all but *domiciliaries.*

A difference between the concepts of residence and domicile has long been recognized. See, *e. g., Mitchell* v. *United States,* 21 Wall. 350 (1875); *Penfield* v. *Chesapeake, O. & S. R. Co.,* 134 U. S. 351 (1890); *Texas* v. *Florida,* 306 U. S. 398 (1939). A person is generally a resident of any State with which he has a well-settled connection. "[M]ere lodging or boarding or temporary occupation" is not enough to establish a residence. *Dwyer* v. *Matson,* 163 F. 2d 299, 303 (CA10 1947). See generally Reese & Green, That Elusive Word, "Residence," 6 Vand. L. Rev. 561, 563 (1953). Under the law of Texas, for example, "[r]esidence may be temporary or permanent in nature. However, residence generally requires some condition greater than mere lodging. The term implies a place of abode, albeit temporary, rather than a mere transient lodging." *Whitney* v. *State,* 472 S. W. 2d 524, 525 (Tex. Crim. App. 1971) (citation omitted). See, *e. g., Brown* v. *Boulden,* 18 Tex. 431, 432 (1857); *Travelers Indemnity Co.* v. *Mattox,* 345 S. W. 2d 290, 292 (Tex. Civ. App. 1961); *Prince* v. *Inman,* 280 S. W. 2d 779 (Tex. Civ. App. 1955). "Intent to remain indefinitely" in the State need not be shown in order to be considered a resident of a

durational requirements had been a traditional component of eligibility for voting in state elections and for many other public privileges. See *Pope* v. *Williams,* 193 U. S. 621 (1904) (upholding one-year durational residence requirement for voting in Maryland elections). Indeed, durational residence requirements continue to be valid for various purposes other than voting. See, *e. g., Sosna* v. *Iowa,* 419 U. S. 393 (1975) (upholding Iowa statutory requirement that a petitioner in a divorce action be a resident of the State for one year preceding the filing of the petition).

State.[5]   As the Texas Supreme Court stated in *Snyder* v. *Pitts*, 150 Tex. 407, 413, 241 S. W. 2d 136, 139 (1951), "[f]rom the fact that there can be but one domicile and several residences, we arrive at the conclusion that the element of 'intent to make it a permanent home' is not necessary to the establishment of a second residence away from the domicile."

---

[5] The majority erroneously relies on *Inhabitants of Warren* v. *Inhabitants of Thomaston*, 43 Me. 406 (1857), to support its view that "a bona fide intention to remain . . . indefinitely," *ante*, at 332, "has been recognized as [part of] a minimum standard" for establishing residence. *Ante*, at 331. The question in that case was whether a person who had lived and worked in various different towns during the previous five years had established a residence in defendant town for the purposes of state pauper laws. The court indicated that the individual would have acquired a residence if he lived in the town "without any present intention to remove therefrom," 43 Me., at 418, even if he later left the town for extended periods of time. The court did not hold, however, that an individual cannot also establish a residence for the purpose of state pauper laws if he lived in a town with the intent to remain for a fixed, but relatively long period of time. In fact, the court suggested just the opposite when it stated that "[t]o reside is to dwell permanently, *or for a length of time*," *id.*, at 417 (emphasis added). As the Maine Supreme Court stated in *North Yarmouth* v. *West Gardiner*, 58 Me. 207, 211 (1870), "so far as intention is a necessary element of a 'residence,' it will be conclusively inferred from an actual presence accompanied with such circumstances as usually surround a home."

The Court's reliance on various other state decisions, *ante*, at 331, n. 12, is equally misplaced. These cases involve state statutes which expressly incorporate a domicile standard or have been so interpreted by the state courts. These cases do not involve the traditional or common-law concept of residence at all, but involve that term as specifically defined under a particular state statute. For example, in *Estate of Schoof* v. *Schoof*, 193 Kan. 611, 614, 396 P. 2d 329, 331 (1964), the court expressly interpreted the term "residence" to refer to the common-law concept of "domicile" for the purposes of a state statute involving probate of a will, for which one State or county necessarily must be given priority. Similarly, in *Hughes* v. *Illinois Public Aid Comm'n*, 2 Ill. 2d 374, 380–381, 118 N. E. 2d 14, 18 (1954), the court considered a statute which defined a "resident" as one who has "made his or her permanent home in this State for a continuous period of one year." See generally Restatement (Second) of Conflict of Laws § 11, Comment *k* (1971).

On the other hand, an individual has only one domicile, which is generally the State with which he is currently most closely connected, but which may be a State with which he was closely connected in the past. See generally *Williams* v. *North Carolina,* 325 U. S. 226, 229 (1945); *District of Columbia* v. *Murphy,* 314 U. S. 441 (1941); *Williamson* v. *Osenton,* 232 U. S. 619 (1914). Traditionally, an individual has been said to acquire a new domicile when he resides in a State with "the absence of any intention to live elsewhere," *id.,* at 624, or with "'the absence of any present intention of not residing permanently or indefinitely in' the new abode." *Ibid.,* citing A. Dicey, The Conflict of Laws 111 (2d ed. 1908). The concept of domicile has typically been reserved for purposes that clearly require general recognition of a single State with which the individual, actually or presumptively, is most closely connected.[6]

The majority errs in assuming that, as a general matter, States are free to close their schools to all but domiciliaries of the State. To begin with, it is clear that *residence,* not domicile, is the traditional standard of eligibility for lower school education,[7] just as residence often has been used to deter-

---

[6] For example, in order to avoid conflicts of laws or jurisdictions, the law of an individual's domicile generally governs such matters as the distribution of his property after death, and the probate of a will and the appointment of an administrator generally occur in the domicile of the deceased. A test requiring both domicile and residence has often been used for purposes of voting, in order to define the group with the greatest interest in the political destiny of the community. See, *e. g., Hershkoff* v. *Board of Registrars of Voters,* 366 Mass. 570, 576–578, 321 N. E. 2d 656, 663 (1974).

Domicile has also been recognized as a basis for exercising personal jurisdiction over a defendant absent from the jurisdiction. *Milliken* v. *Meyer,* 311 U. S. 457 (1940). Moreover, as the majority notes, *ante,* at 327–328, n. 6, this Court has suggested that a domicile requirement may be adopted for determining who may benefit from preferential tuition rates at a state university. *Vlandis* v. *Kline,* 412 U. S. 441, 454 (1973).

[7] See, *e. g., Cline* v. *Knight,* 111 Colo. 8, 137 P. 2d 680 (1943); *Yale* v. *West Middle School District,* 59 Conn. 489, 22 A. 295 (1890); *Ashley* v.

mine whether an individual is subject to state income tax, whether his property in the State is exempt from attachment, and whether he is subject to jury duty.[8]  Moreover, this Court's prior decisions which speak of the constitutionality of a bona fide *residence* standard provide no support for the majority's assumption.  Although this Court has referred to a domicile requirement with approval in the context of higher education, it is incumbent upon the State of Texas to demonstrate that the classification transplanted from another statutory scheme is justified by *"'the purposes for which the state desires to use it.'"*  *Plyler* v. *Doe*, 457 U. S. 202, 226 (1982), quoting *Oyama* v. *California*, 332 U. S. 633, 664–665 (1948) (Murphy, J., concurring).

## B

Even assuming that a State may constitutionally deny free public education to all persons, including residents, who fail to meet the traditional standard for acquiring a domicile, this

*Board of Education*, 275 Ill. 274, 114 N. E. 20 (1916); *Mt. Hope School District* v. *Hendrickson*, 197 Iowa 191, 197 N. W. 47 (1924); *Township of Mancelona* v. *Township of Custer*, 236 Mich. 677, 211 N. W. 60 (1926); *McNish* v. *State, ex rel. Dimick*, 74 Neb. 261, 104 N. W. 186 (1905); *Lisbon* v. *Landaff*, 75 N. H. 324, 74 A. 186 (1909); *People ex rel. B. C. A. Soc.* v. *Hendrickson*, 54 Misc. 337, 104 N. Y. S. 122 (Sup. Ct. 1907); *Board of Education* v. *Hobbs*, 8 Okla. 293, 56 P. 1052 (1899); *I. O. O. F.* v. *Board of Education*, 90 W. Va. 8, 110 S. E. 440 (1922); *State* v. *Thayer*, 74 Wis. 48, 41 N. W. 1014 (1889).

[8] Residence has also been used to determine eligibility for public benefits other than education.   See, *e. g., Town of Winchester* v. *Town of Burlington*, 128 Conn. 185, 188, 21 A. 2d 371, 373 (1941) (pauper statutes); *North Yarmouth* v. *West Gardiner*, 58 Me. 207 (1870) (pauper statutes); *Ortman* v. *Miller*, 33 Mich. App. 451, 190 N. W. 2d 242 (1971) (Michigan Motor Vehicles Accident Fund); *State ex rel. Timo* v. *Juvenile Court of Wadena County*, 188 Minn. 125, 246 N. W. 544 (1933) (poor relief); *Collins* v. *Yancey*, 55 N. J. Super. 514, 522, 151 A. 2d 68, 73 (1959) (Unsatisfied Claim and Judgment Fund Law); *Baldwin* v. *Tiffany*, 250 N. Y. 489, 166 N. E. 177 (1929) (treatment in state mental hospital); *Adams County* v. *Burleigh County*, 69 N. D. 780, 787, 291 N. W. 281, 285 (1940) (pauper laws); *Jamaica* v. *Townshend*, 19 Vt. 267 (1847) (pauper laws).

is not what the Texas statute does. Section 21.031(d) operates to deny public education to some persons who meet the traditional standard. As interpreted by the Court, the Texas statute denies free public education to any child who intends to leave the district at some point in the future. Yet such an intention does not preclude an individual from being considered a domiciliary under the prevailing conception of domicile.

When a person lives in a single geographical area, which is the center of his domestic, social, and civil life, that place has all the indicia of his domicile, and will generally be so regarded irrespective of his intent to make a home somewhere else in the distant future.[9]

> "A man may acquire a domicile, if he be personally present in a place and elect that as his home, even if he never design to remain there always, but design at the end of some short time to remove and acquire another. A clergyman of the Methodist Church who is settled for two years may surely make his home for two years with his flock, although he means, at the end of that period, to remove and gain another." Report of the Committee on Elections re *Cessna* v. *Meyers*, H. R. Rep. No. 11, 42d Cong., 2d Sess., 3 (1872).

Thus, the majority is surely incorrect when it states that an individual who intends to leave the district as many as 10

---

[9] See, *e. g.*, *Hawes* v. *Club Ecuestre El Commandante*, 598 F. 2d 698, 701–702 (CA1 1979); *Pedigo* v. *Grimes*, 113 Ind. 148, 13 N. E. 700 (1887); *Brittenham* v. *Robinson*, 18 Ind. App. 502, 48 N. E. 616 (1897); *Paulson* v. *Forest City Community School Dist.*, 238 N. W. 2d 344, 349 (Iowa 1976); *Hershkoff* v. *Board of Registrars of Voters, supra*, at 578–579, 321 N. E. 2d, at 664; *Robbins* v. *Chamberlain*, 297 N. Y. 108, 75 N. E. 2d 617 (1947); *Lloyd* v. *Babb*, 296 N. C. 416, 444, 251 S. E. 2d 843, 861 (1979); *Jamaica* v. *Townshend, supra*. See generally Restatement (Second) of Conflict of Laws §§ 11–12, 18 (1971); H. Goodrich, Conflict of Laws 35–36 (1927); R. Leflar, American Conflicts Law § 10 (3d ed. 1977).

years later cannot possibly satisfy general domicile requirements. *Ante,* at 330, n. 10.[10]

## C

Even if it were permissible to deny free education to residents who expect to leave the State at some future date, the statute could not escape constitutional scrutiny because it does not apply this test uniformly. Under Tex. Educ. Code Ann. § 21.031 (Supp. 1982–1983), the public free schools of Texas are generally open to any child who is a resident of the State. Admission is not limited to residents who intend to remain indefinitely in Texas. See *Brownsville Independent School Dist.* v. *Gamboa,* 498 S. W. 2d 448, 450 (Tex. Civ. App. 1973).[11] As the Attorney General of Texas explained in

---

[10] An individual's motive for entering a State, while evidence of whether he intends to make his home there, is also not conclusive in determining whether that individual is a domiciliary of the State. Assuming that an individual has otherwise satisfied the general requirements for acquiring a domicile in a State, "it is immaterial what motives led the person to go there. It makes no difference whether these motives were good or bad or, more specifically, whether the move to the new location was for purposes of health, to accept a job, to avoid taxation, to secure a divorce, to bring suit in the federal courts or even to facilitate a life of sin or crime." Restatement (Second) of Conflict of Laws § 18, Comment *f* (1971). See, *e. g.,* *Young* v. *Pollak & Co.,* 85 Ala. 439, 5 So. 279 (1888). An individual who has otherwise satisfied the state domicile requirements has traditionally been entitled to take advantage of the particular state benefits which motivated his change of domicile. See, *e. g., Williamson* v. *Osenton,* 232 U. S. 619, 625 (1914); *Jones* v. *League,* 18 How. 76, 81 (1855); *Schultz* v. *Chicago City Bank & Trust Co.,* 384 Ill. 148, 51 N. E. 2d 140 (1943); *Cooper* v. *Cooper,* 217 N. W. 2d 584 (Iowa 1974); *McConnell* v. *Kelley,* 138 Mass. 372 (1885); *Nichols* v. *Nichols,* 538 S. W. 2d 727 (Mo. App. 1976). Thus, under the traditional criteria for acquiring a domicile, an individual would not be denied a public education solely because he entered the State for the purpose of attending its local schools.

[11] In *Brownsville Independent School Dist.* v. *Gamboa,* the Texas court considered whether a School District had improperly excluded two children who claimed that they were eligible to attend the local free schools under Tex. Educ. Code Ann. § 21.031, prior to the amendment of that provision in 1977 to add subsection (d). One child, an American citizen by reason of

*Plyler* v. *Doe*, 457 U. S., at 227, n. 22, "if, for example, a Virginian or a legally admitted Mexican citizen entered Tyler with his school-age children, intending to remain only six months, those children would be viewed as residents entitled to attend Tyler schools." Thus, under § 21.031, "[t]he State provides free public education to all lawful residents whether they intend to reside permanently in the State or only reside in the State temporarily." 457 U. S., at 240, n. 4 (POWELL, J., concurring). The only exception is children who live apart from their parents or legal guardians for educational purposes. Those children, unlike all others, must intend to remain indefinitely in a particular school district in the State in order to attend its schools.

Because the intent requirement is applied to only one class of children, it cannot be characterized as a bona fide residence requirement. As the majority recognizes, *ante*, at 328, a State may not pick and choose among classes of state inhabitants to decide which will be subject to particularly difficult or preclusive eligibility standards. This premise underlies decisions striking down state statutes which create a presumption that particular classes of individuals are not residents because of either where they live in the State, see *Evans* v. *Cornman*, 398 U. S. 419 (1970), or what jobs they hold. See *Carrington* v. *Rash*, 380 U. S. 89 (1965).[12] This

---

birth in Texas, had lived in Mexico since infancy with parents who were Mexican citizens. At the age of six he left his parents' home and came to live with his maternal aunt in Brownsville for the purpose of attending the public free schools. He lived in his aunt's home as part of her household for 16 months with only a single brief interruption. She was appointed the child's guardian. The court concluded from this that "[t]here is sufficient permanency in the plaintiff's residence status within the defendant's district to satisfy the statutory requirement" of residence. 498 S. W. 2d, at 450.

[12] In *Carrington* v. *Rash*, for example, the Court held that the Equal Protection Clause was violated by a Texas constitutional provision that no serviceman may acquire a voting residence in the State so long as he remains in the service. We stated that the State may not conclusively presume that members of a particular profession are transient inhabitants, but

principle was reaffirmed last Term in *Plyler* v. *Doe* which struck down provisions of Tex. Educ. Code Ann. § 21.031 (Supp. 1982–1983) which denied a free public education to undocumented school-age children. The State of Texas defended the alienage classification as a mere residence requirement. This Court rejected the assertion because the provisions excluded undocumented children who "comply with the established standards by which the State historically tests residence." 457 U. S., at 227, n. 22. We observed that while the State is "as free to apply to undocumented children established criteria for determining residence as [it is] to apply those criteria to any other child who seeks admission," the State's classification will not escape constitutional scrutiny merely because it "defin[es] a disfavored group as nonresident." *Ibid.*

## III

I continue to believe that, in analyzing a classification under the Equal Protection Clause, the appropriate level of scrutiny depends on "the constitutional and societal importance of the interest adversely affected and the recognized invidiousness of the basis upon which the particular classification is drawn." *San Antonio Independent School District* v. *Rodriguez,* 411 U. S. 1, 99 (1973) (MARSHALL, J., dissenting). It has become increasingly clear that the approach actually taken in our cases focuses "upon the character of the classification in question, the relative importance to individuals in the class discriminated against of the governmental benefits that they do not receive, and the asserted state interests in support of the classification." *Dandridge* v. *Williams,* 397 U. S. 471, 520–521 (1970) (MARSHALL, J., dissenting). See, *e. g., Mississippi University for Women* v. *Hogan,* 458 U. S. 718 (1982); *Plyler* v. *Doe, supra; Zobel* v.

---

must instead apply the "more precise tests to determine the bona fides of an individual claiming to have actually made his home in the State long enough to vote," just as it applies those tests to all others seeking to vote in the State. 380 U. S., at 95.

*Williams,* 457 U. S. 55 (1982). In my view, § 21.031 cannot withstand the careful scrutiny that I believe is warranted under the Equal Protection Clause.

A

The majority reasons that because § 21.031 imposes a bona fide residence requirement in a uniform fashion, it is *ipso facto* constitutional. As the foregoing has demonstrated, § 21.031 is neither a bona fide residence requirement nor one which is uniformly applied to all school-age children living in Texas. Quite the contrary, § 21.031 denies free public education to some persons who satisfy the traditional tests not only of residence but also of domicile. In my view § 21.031 should be subjected to careful judicial scrutiny.

The interest adversely affected by § 21.031, a child's education, is one which I continue to regard as fundamental. See *San Antonio Independent School District* v. *Rodriguez,* 411 U. S., at 110–117 (MARSHALL, J., dissenting). The fundamental importance of education is reflected in "the unique status accorded public education by our society, and by the close relationship between education and some of our most basic constitutional values." *Id.,* at 111 (MARSHALL, J., dissenting). Last Term's decision in *Plyler* v. *Doe,* 457 U. S., at 221–223, is the most recent decision of this Court to recognize the special importance of education. See also *id.,* at 234 (BLACKMUN, J., concurring) ("[W]hen the State provides an education to some and denies it to others, it immediately and inevitably creates class distinctions of a type fundamentally inconsistent with [many of the] purposes . . . of the Equal Protection Clause"). Therefore, simply on the ground that § 21.031 significantly impedes access to education,[13] I would subject the statutory classification to careful scrutiny.[14]

---

[13] That the statute may not, in all cases, absolutely preclude a child from attaining an education is, of course, irrelevant. See, *e. g., Mississippi University for Women* v. *Hogan,* 458 U. S. 718 (1982).

[14] Careful scrutiny is particularly appropriate because the classification burdens a child's right to reside in the State, which is an element of the

## B

The Texas statute is not narrowly tailored to achieve a substantial state interest. The State of Texas does not attempt to justify the classification by reference to its interest in the safety and well-being of children within its boundaries. The State instead contends that the principal purpose of the classification is to preserve educational and financial resources for those most closely connected to the State. *Ante,* at 329–330, n. 9.[15] The classification of children according to

constitutional right to travel. *Edwards* v. *California,* 314 U. S. 160, 183 (1941) (Jackson, J., concurring). See generally *Zobel* v. *Williams,* 457 U. S. 55, 66–68 (1982) (BRENNAN, J., concurring); *id.,* at 76–77 (O'CONNOR, J., concurring). We have made clear in the past that the right to travel includes the right to reside in the State in order to take advantage of particular state benefits. On its face, a classification based upon a person's motive for residing in the State burdens that right. Thus, in striking the durational residence requirement for welfare benefits at issue in *Shapiro* v. *Thompson,* this Court specifically rejected as illegitimate a State's purported interest in "discourag[ing] those indigents who would enter the State solely to obtain larger benefits," 394 U. S., at 631. The Court stated:

"[F]undamentally, a State may no more try to fence out those indigents who seek higher welfare benefits than it may try to fence out indigents generally. Implicit in any such distinction is the notion that indigents who enter a State with the hope of securing higher welfare benefits are somehow less deserving than indigents who do not take this consideration into account. But we do not perceive why a mother who is seeking to make a new life for herself and her children should be regarded as less deserving because she considers, among other factors, the level of a State's public assistance. *Surely such a mother is no less deserving than a mother who moves into a particular State in order to take advantage of its better educational facilities.*" *Id.,* at 631–632 (emphasis added).

See also *Memorial Hospital* v. *Maricopa County,* 415 U. S., at 263. Cf. *Doe* v. *Bolton,* 410 U. S. 179, 200 (1973).

[15] "[A] concern for the preservation of resources standing alone can hardly justify the classification used in allocating those resources. . . . [A] State may 'not . . . reduce expenditures for education by barring [some arbitrarily chosen class of] children from its schools.'" *Plyler* v. *Doe,* 457 U. S., at 227, 229, quoting *Shapiro* v. *Thompson,* 394 U. S., at 633.

their motive for residing in the State cannot be justified as a narrowly tailored means of limiting public education to children "closely connected" with the State. Under the Texas scheme, some children who are "residents" of the State in every sense of that word are nevertheless denied an education. Other children whose only connection with the State is their physical presence are entitled to free public education as long as their presence is not motivated by a desire to obtain a free education. A child residing in the State for *any other reason*, no matter how ephemeral, will receive a free education even if he plans to leave before the end of the school year. Whatever interest a State may have in preserving its educational resources for those who have a sufficiently close connection with the State, that interest does not justify a crude statutory classification which grants and withholds public education on a basis which is related only in a haphazard way to the extent of that child's connection with the State. Cf. *Plyler* v. *Doe, supra,* at 227.

For similar reasons, the statute is not carefully designed to reserve state resources only for those who will have the most enduring connection with the State.[16] As a general matter, the State concededly enrolls "school-age children [who intend] to remain only six months" in Texas. *Plyler* v. *Doe, supra,* at 227, n. 22. For example, "if a child comes to Texas for six months for health reasons, he would qualify for tuition-free education." *Ante,* at 333. Yet the State excludes from its schools a child who enters the district at the age of seven with the intent to remain for at least 10 more years in order to complete his education.

The State also seeks to justify § 21.031(d) as a means of preventing undesirable fluctuations in the student population from year to year. *Ante,* at 329, n. 9. The classification of students based on their motive for residing in the State can-

---

[16] I have some doubt whether, beyond a certain point, a State may distinguish between its residents based on the length of time that they are likely to remain in the State. Cf. *Zobel* v. *Williams, supra.*

not be justified on this basis. To begin with, Texas may not rely on a vague, unsubstantiated fear that, in the absence of a barrier to migration, children throughout the State and from outside the State will leave their parents and relocate within Texas solely to attend the school of a particular district, and that they will do so in numbers that are wholly unpredictable. There is no evidence whatsoever that the migration of school-age children in unpredictable numbers has caused administrative problems, and the mere conjecture that such problems would arise in the absence of § 21.031(d) cannot be the basis for upholding a classification that singles out some children who reside in the State and denies them a public education. Cf. *Memorial Hospital* v. *Maricopa County*, 415 U. S. 250, 268–269 (1974); *Shapiro* v. *Thompson*, 394 U. S. 618, 634–635 (1969).[17]

Moreover, even if such evidence were available, § 21.031 cannot be justified as a means of preventing interdistrict migration of students whose parents live in Texas, since the provision was not enacted with that general problem in mind. See *Schlesinger* v. *Ballard*, 419 U. S. 498, 520 (1975) (BRENNAN, J., dissenting); *McGinnis* v. *Royster*, 410 U. S. 263, 270 (1973) (the challenged classification must further "some legitimate, *articulated* state purpose") (emphasis added). As the Court of Appeals of Texas acknowledged, "§ 21.031(d) was enacted in response to litigation regarding the rights of *alien* children to attend Texas schools." *Jackson* v. *Waco Independent School Dist.*, 629 S. W. 2d 201, 205 (1982) (emphasis added). Indeed, § 21.031(d) is not needed to redress the problems caused by interdistrict migration, since school

---

[17] On its face, the claim that many students will leave their parents' homes solely to move to a more attractive school district within the State is implausible. One may assume that, as a general rule, parents have a significant interest in living with their children, and that the difficulty of finding a custodian who will make a home for their child would create a practical impediment even for those parents willing to part with their children.

districts have authority quite apart from that provision for requiring students to attend the school in the district within the State in which their parents reside. *Ibid.*, citing Tex. Educ. Code Ann. § 23.26 (1972). Because "the statutory provisions at issue were shaped by forces other than" a general concern with student migration within the State, *Trimble* v. *Gordon*, 430 U. S. 762, 775 (1977), that broad concern cannot provide a basis for upholding the statute. Rather, to the extent that concern over fluctuations in student populations underlies § 21.031(d), it must be a concern over the migration into Texas of children from other States and from other countries. There is simply no basis for concluding, however, that interstate migration has or will cause serious problems related to fluctuations in the number of students in each school district.[18]

Finally, whatever the magnitude of the problems associated with fluctuations in the student population because of migration from without the State, the motive requirement of § 21.031(d) is simply not narrowly tailored to further the state interest in minimizing fluctuations. Just as there is nothing to suggest that the number of children who enter Texas for educational purposes will vary significantly from year to year, there is certainly nothing to suggest that their number will vary to a greater extent than the number who enter for all other purposes. Moreover, once children enter the State

---

[18] Respondents place considerable reliance on a study of student migration from Mexico that was undertaken shortly before enactment of § 21.031. J. Hensley, The Impact of Students From Mexico Upon Selected School Districts in Texas Counties Adjacent to the Mexican Border (1976). Superintendents of 22 Texas school districts nearest the Mexican border were interviewed. Nearly 75% agreed that increases in enrollment by immigrant students were primarily attributable to economic factors such as the availability of jobs in the United States, rather than to educational factors. *Id.*, at 80. Over 80% found that the increases in enrollment were not unexpected. *Id.*, at 75. No inquiry was conducted into the number of children living apart from their parents or guardian for the purpose of attending school.

for educational purposes, they are likely to be the among the most stable members of the school-age population. It is by definition a matter of primary importance to such children that they remain in the district until they complete their schooling. All other children, to whom attending the local schools is a matter of comparative unimportance, may have little tie to the State or to a particular district within the State during their school years. Indeed, under the Texas statute a child who resides in the State for any purpose other than to attend the local schools is entitled to free education even if he expressly intends to remain for less than a year. Yet a child who resides in the State in order to attend its schools is denied an education even if he intends to remain until he has completed 12 full years of primary and secondary education. This disparate treatment cannot be justified by any alleged state concern over fluctuating student populations.

## IV

For the foregoing reasons, I reject the majority's conclusion that the Texas statute may be upheld on the ground that it is far more generous than a traditional residence requirement for public education. To the contrary, the statute is less generous since it excludes a class of children who ordinarily would be regarded as Texas residents. Because I believe that the State has not adequately justified its denial of public education to one small class of school-age residents, I would hold that § 21.031(d) violates the Equal Protection Clause. I therefore dissent.