

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-10-1995

# Juvelis v Snider

Precedential or Non-Precedential:

Docket 94-2207

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

## Recommended Citation

"Juvelis v Snider" (1995). *1995 Decisions.* Paper 263.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/263

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

——————

No. 94-2207

——————


NIKITAS JUVELIS, an incompetent,
by his father and next friend, GEORGE JUVELIS

v.

KAREN SNIDER, in her official capacity as
the Secretary of the Department of Public Welfare,
Commonwealth of Pennsylvania,

                                        Appellant


_____


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 93-cv-02911)

——————————


Argued July 20, 1995

Before:  SLOVITER, Chief Judge,
SCIRICA and McKEE, Circuit Judges

(Filed: October 10, 1995)

                KATE L. MERSHIMER, ESQUIRE (ARGUED)
                Office of Attorney General
                  of Pennsylvania
                Strawberry Square, 15th Floor
                Harrisburg, Pennsylvania 17120
                  Attorney for Appellant


                EDMOND A. TIRYAK, ESQUIRE (ARGUED)
                The Curtis Center, Suite 1100
                6th and Walnut Streets
                Philadelphia, Pennsylvania 19106
                  Attorney for Appellee

1

———————————————

OPINION OF THE COURT

———————————————

SCIRICA, <u>Circuit</u> <u>Judge</u>.


In this case we must decide whether the policy of Pennsylvania's Department of Public Welfare requiring intent to establish domicile discriminates under section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) (1988), against a profoundly retarded individual on the basis of his handicap. The district court found the policy discriminatory and required the Department of Public Welfare to fund retardation services for the plaintiff Nikitas Juvelis. We will affirm.

I.

Nikitas Juvelis (Niki) is a profoundly retarded and physically handicapped 33 year old citizen of the United States.[0] Although Niki's parents are also United States citizens, they have lived in Venezuela since Niki's birth. When Niki was fifteen, his parents placed him, at their expense, in the Melmark Home, a residential home for the handicapped in Delaware County, Pennsylvania. He has lived there continuously for the past eighteen years. Prior to Niki's placement in Melmark, his parents had no connection to Pennsylvania. In recent years, Melmark's costs have gone up sharply, while Niki's parents have gotten older and their income has declined. The Juvelises

---

[0]The American Association for Mental Deficiencies defines profoundly retarded individuals as those with I.Q. scores below 20. Niki additionally has cerebral palsy and clubbed feet and is confined to a wheelchair.

anticipate that soon they will be unable to afford Niki's fees at Melmark.[0]

Pennsylvania's Department of Public Welfare (DPW) provides benefits to retarded persons, which can include payment for placements in facilities like Melmark. The Juvelises applied for such coverage for Niki. DPW policy gives the counties primary responsibility for determining eligibility for mental retardation services. But the counties may not expend state funds to provide services for a person who is not a state resident. Niki was turned down for coverage because, for funding purposes, he was not considered a bona fide resident[0] of Delaware County or of Pennsylvania. This residency determination was made on the basis of DPW policy, but that policy is nowhere codified as a rule or regulation.

Generally, the policy on residency requires the county to determine the domicile of the individual prior to placement. In this case, because Niki was a minor before placement, he was a resident of his parents' domicile, Venezuela. When an individual reaches majority, DPW presumes he retains his parents' domicile

---

[0] When Niki first arrived at Melmark, the cost of tuition was $11,000 per year. Currently, Melmark's tuition is $60,000. Over the past eighteen years, the Juvelises have paid several hundred thousand dollars to Melmark.

[0] A bona fide resident is one who is legally domiciled in Pennsylvania. See discussion infra, part V. We recognize the distinction between domicile and residence. See, e.g., 13B Charles A. Wright et al., Federal Practice and Procedure § 3612 (2d ed. 1984) ("[T]he domicile of a person is the place where he has his true, fixed home and principal establishment, and to which, whenever he is absent, he has the intention of returning. Domicile . . . is more than an individual's residence, although the two typically coincide."). In this opinion, when we say residence, we are referring to bona fide residence or domicile.

3

unless and until he establishes a new one. Proof of change of domicile has two components: physical presence plus an intent to remain. Niki has physical presence in Delaware County, Pennsylvania. What he lacks is the mental capacity to form an intent to remain. The crux of this case is whether a residency requirement that depends on mental capacity is discriminatory in a way that violates § 504 of the Rehabilitation Act. To answer this question, we must determine whether residency is essential to DPW's program and whether Niki can satisfy the residency requirement under a reasonable modification to DPW's policy. Easley v. Snider, 36 F.3d 297, 300 (3d Cir. 1994). "The test to determine the reasonableness of a modification is whether it alters the essential nature of the program or imposes an undue burden or hardship in light of the overall program." Id. at 305. Accordingly, DPW must show that it cannot employ an exception to its residency policy that would accommodate profoundly retarded persons without incurring an undue burden or modifying the essential nature of its program.

## II.

> Section 504 of the Rehabilitation Act provides: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."

29 U.S.C. § 794(a) (1988 & Supp. IV 1992). As a recipient of federal financial assistance, DPW is subject to the requirements of § 504. DPW maintains that Niki is not "otherwise qualified"

4

for inclusion in Pennsylvania's mental retardation program because he is not a Pennsylvania resident. The Juvelises contend that Pennsylvania's policy for determining residency makes Niki's exclusion "solely by reason of" his retardation. DPW counters that it cannot modify implementation of its residency requirement in a way that would accommodate Niki's handicap without making fundamental changes to its program that would impose an undue burden on the Commonwealth.

III.

The Juvelises sued the Secretary of DPW alleging the policy violated § 504 of the Rehabilitation Act, his constitutional right to travel, and his constitutional rights to procedural and substantive due process. Because there was no dispute as to any material fact, the district court referred the cross motions for summary judgment to the magistrate judge.

The magistrate judge issued a report and recommendation that plaintiff's motion for summary judgment be granted on the ground that DPW policy violated the Rehabilitation Act.[0] Both parties filed objections. The district court approved the magistrate judge's finding that DPW's policy violated § 504, and, without setting a timetable, ordered DPW to develop and implement a mechanism that would allow the Commonwealth to apply its residency requirement in a manner that does not discriminate

---

[0] She also recommended denying defendant's motion for summary judgment. Having disposed of the case on statutory grounds, the magistrate judge did not reach the constitutional issues.

5

against retarded persons. Meanwhile, the court enjoined DPW from denying Niki benefits.

The Juvelises filed a motion for reconsideration, objecting that the court had failed to provide the parties an opportunity to be heard on the relief. The district court granted the motion for reconsideration, vacated its prior order, and ordered instead (1) approval and adoption of the magistrate judge's report and recommendation, (2) denial of DPW's motion for summary judgment, (3) grant of the Juvelises' motion for summary judgment, and (4) a declaration that DPW's residency policy violates § 504 and that Niki is eligible for mental retardation services.

The district court had subject matter jurisdiction of these federal claims under 28 U.S.C. §§ 1331 and 1343. We have jurisdiction of a final decision of the district court. 28 U.S.C. § 1291 (1988). In reviewing dispositions on summary judgment, we apply the same test the district court should have used. Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976), cert. denied, 429 U.S. 1038 (1977).

IV.

This case presents the narrow question whether DPW can employ an exception to its residency policy that would accommodate a profoundly retarded person without incurring an undue burden or modifying the essential nature of the program. We believe it can.

A.

DPW maintains Niki neither is an "otherwise qualified" person, nor has been discriminated against because of his handicap. "An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." Southeastern Community College v. Davis, 442 U.S. 397, 406 (1979). DPW contends Niki is not "otherwise qualified" because he lacks the capacity to form the intent to establish Delaware County or Pennsylvania as his residence. But "an individual may be otherwise qualified in some instances even though he cannot meet all of a program's requirements." Wagner v. Fair Acres Geriatric Center, 49 F.3d 1002, 1009 (3d Cir. 1995). "The benefit . . . cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled; to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made." Alexander v. Choate, 469 U.S. 287, 300 (1985). Furthermore, we have recognized that § 504 requires some affirmative steps to accommodate handicapped persons. Nathanson v. Medical College of Pennsylvania, 926 F.2d 1368, 1385 (3d Cir. 1991). The burden is on the recipient of federal funds "to show that the required modification entails a substantial alteration in order to avoid a violation of the Act." Id. "[I]f there is no factual basis in the record demonstrating that accommodating the individual would require a fundamental modification or an undue burden, then the handicapped person is otherwise qualified and refusal to waive the requirement is discriminatory." Easley v. Snider, 36 F.3d at 302. See also Wagner, 49 F.3d at 1016-17

7

(summary judgment reversed because center failed to offer any factual basis demonstrating that admission of plaintiff would have changed the essential nature of the facility or imposed an undue burden).

DPW concedes that but for his inability to meet the residency test, Niki is qualified for participation in the program providing retardation services. Accordingly, DPW must demonstrate that accommodating Niki would require a fundamental modification of its program or impose an undue burden. This DPW has failed to do.[0]

B.

DPW contends that accommodating Niki would impermissibly require modification of the essential nature of its program and impose an undue burden. "The first step in resolving this dispute must be to ascertain the essential nature of the . . . program." Strathie v. Department of Transp., 716 F.2d 227, 231 (3d Cir. 1983). The essential nature of the program is to provide mental retardation services for Pennsylvania residents.[0] Thus, DPW maintains, and we agree, that residency is fundamental

---

[0] DPW misperceives the burden of proof on this issue. In its brief, DPW states, "[T]here is nothing in the record to indicate that Mr. Juvelis's proposed accommodation would be an easily administered test." The burden, however, does not lie on Niki to show the accommodation could be easily administered. Rather, the burden is on DPW to demonstrate that adjusting its requirements would fundamentally alter the program or impose an undue burden on the department.

[0] Pennsylvania's Mental Health and Mental Retardation Act of 1966, as amended, Pa. Stat. Ann. tit. 50, §§ 4101–4704 (Purdon 1969 & 1994 Supp.), set up a comprehensive system providing various mental retardation services for Pennsylvania residents, including day programs, family support services, and residential placements.

8

to this state funded system and Pennsylvania domicile is part of the essential nature of its program. See, e.g. Martinez v. Bynum, 461 U.S. 321, 327 (1983) (states have a legitimate interest in assuring that services provided to its residents are only used by its residents). But the Juvelises have not asked for elimination of the residency requirement altogether. All they are seeking is an exception from the intent component of the residency test for their profoundly handicapped child. DPW has not demonstrated that provision of mental health services for Niki, who has resided in Pennsylvania for eighteen years, will interfere with the essential nature of its program.

DPW also contends intent is an essential element of domicile (which presumably makes it essential to its program). But under its present policy, DPW already makes an exception from the traditional intent requirement for residency, applying a presumption that an incompetent individual must intend to adopt the domicile of his parents as of the time he turned eighteen. Although the purpose of this policy is to provide benefits only to individuals whose parents are domiciled in Pennsylvania, the exception discriminates against profoundly retarded individuals like Niki, whose parents live elsewhere, but who are themselves long term residents of the Commonwealth. DPW has not demonstrated that another exception to the intent component would compromise the essential nature of its program or be unduly burdensome.

V.

9

The Juvelises argue for an exception to DPW's policy, contending that Niki should be permitted to rebut the presumption that he retains his parents' domicile and prove that he has established legal residency in Pennsylvania. In order to analyze the impact of such an exception on the essential nature of the program and whether it would constitute an undue burden, we will examine the traditional ways of proving intent to change domicile.

A.

"Although the meaning may vary according to context, `residence' generally requires both physical presence and an intention to remain." Martinez v. Bynum, 461 U.S. at 330. "In general, the domicile of an individual is his true, fixed and permanent home and place of habitation. It is the place to which, whenever he is absent, he has the intention of returning." Vlandis v. Kline, 412 U.S. 441, 454 (1973) (citing, as reasonable, an official opinion of Connecticut's Attorney General). "Domicile, therefore, has both a physical and a mental dimension . . . ." 13B Charles A. Wright et al., Federal Practice and Procedure § 3612 (2d ed. 1984). Although physical presence yields easily to objective analysis, divining intent can be elusive.

Persuasive evidence of intent can include establishment of a home, Walls v. Ahmed, 832 F. Supp. 940, 943 (E.D. Pa. 1993), place of employment, location of assets, and registration of car, Matter of Estate of Phillips, 604 P.2d 747, 754 (Kan. Ct. App. 1980), and, generally, centering one's business, domestic,

10

social, and civic life in a jurisdiction, <u>Walls v. Ahmed</u>, 832 F. Supp. at 943; <u>Reiersen v. Commissioner of Revenue</u>, 524 N.E.2d 857, 858 (Mass. App.Ct. ), <u>rev. denied</u>, 526 N.E.2d 1295 (Mass. 1988). Motive is not determinative, although it may be important evidence tending to show whether or not there was an intention to make a home. <u>Restatement of Conflict of Laws</u> § 22 (1934); <u>see also</u> <u>Martinez v. Bynum</u>, 461 U.S. at 332–33 (motive betrayed lack of intent to change permanent home); <u>Mansfield Township Board of Ed. v. State Board of Ed.</u>, 129 A. 765, 766 (N.J. Super. 1925) (child who is brought into state by parent or guardian who is nonresident for purpose of receiving education in public schools of state is not a resident).

B.

Although the principle that an incompetent person presumptively lacks the capacity to change domicile is well grounded in common law, the rule is not immutable. <u>Rishell v. Jane Phillips Episcopal Memorial Med. Ctr.</u>, 12 F.3d 171, 173 (10th Cir. 1993). Accordingly, in many instances courts have recognized a change of domicile for an incompetent person. The burden of proof, however, lies on the person seeking to establish a change of domicile.

Courts have permitted incompetents to effect changes of domicile when they have demonstrated subjective attachment to a new home and when objective factors support the conclusion that the change would protect the best interests of the individual. Thus:

11

> The actual mental capacity required for selection of a domicil[e] of choice has been held to be much less than that required generally for the management of an individual's affairs, so that ability merely to have and express a preference with respect to the location of his home has been held sufficient to enable an incompetent to select his domicil[e].

*Estate of Freeman v. Department of Revenue*, 1989 WL 23045, at *3 (Or. Tax 1989) (quoting 96 A.L.R. 2d 1236, 1241 (1964)). "Whether an incompetent may change his domicile depends on the extent to which his reason is impaired. A comparatively slight degree of understanding is required. It is sufficient if he understands the nature and effect of his act." *Coopedge v. Clinton*, 72 F.2d 531, 533 (10th Cir. 1934) (footnote omitted). "It is in every case a question of fact whether a person who is mentally deficient or of unsound mind is able to choose a home." *Restatement of Conflict of Laws* § 40 cmt. a (1934). "The crucial question is whether the person has sufficient mental capacity to choose a home. That he may be incapable of managing his own affairs is not conclusive; nor is the fact that he has been adjudged incompetent and a guardian appointed over his person or property." *Restatement (Second) of Conflict of Laws* § 23 cmt. a (1971). "It has been recognized that, while a person may not be capable of doing some acts, . . . yet he may have a sufficient degree of understanding to change his domicile." *In re Estate of Phillips v. Ververs*, 75 Cal. Rptr. 301, 304 (Cal. Ct. App. 1969) (quoting Goodrich, *Conflict of Laws* (4th ed. Scoles) at 60)).

The principle that an incompetent lacks capacity to change domicile "rests upon the notion the incompetent person's

12

right to declare domicile must be suspended until reason returns to avoid legal consequences that may later harm the person's best interest." Rishell, 12 F.3d at 173 (citing 13B Wright et al., supra, § 3616). "As corollary to the general principle," however, the Tenth Circuit has concluded, "when an incompetent person will never regain reason, preserving the person's right to determine domicile in the future is but a fiction." Id. Furthermore, "[u]nder New York law, a guardian may change the domicile of an incompetent . . . if done in good faith and in the best interest of the conservatee." Love v. Roosevelt Hospital, 1993 WL 190345, at *1 (S.D.N.Y. 1993) (citing Gibbs v. Berger, 399 N.Y.S.2d 304, 307 (N.Y. App. Div. 1977) which relied on objective criteria including length of relationship to New York, probability that incompetent would live out her life in New York, and abandonment of former residence). In Elliot v. Krear, 466 F. Supp. 444 (E.D. Va. 1979), the minor plaintiff's divorced mother, who had legal custody of him, was domiciled in California. But the court held that the minor was domiciled in Virginia, where he was born, had spent all but one year of his life, and where his mother had left him in the actual custody of his grandparents. Id. at 447.

In Dunlap v. Buchanan, 741 F.2d 165, 168 (8th Cir. 1984) the court recognized the issue to be "a factual question of where, considering the mosaic of circumstances surrounding [an incompetent's] care and control, he is domiciled." And in In re Teeter v. California, 141 Cal. Rptr. 103, 106 (Cal. Ct. App. 1977), the court observed that a mentally disturbed patient's

13

intent is often "unascertainable, and therefore it becomes necessary to use objective factors to determine residence." (citing 2 B.E. Witkin, California Procedure (Actions) §§ 445-7, at 1273 et seq. (2d ed. 1970)).

C.

Because only a minimal degree of mental capacity is required to establish a change of domicile, a number of courts have dispensed with reliance on an incompetent individual's articulation of intent in favor of an analysis that relies on "a mosaic of circumstances." Relevant circumstances include the opinions of parents or guardians who are acting in good faith and in the best interest of the individual, as well as objective factors demonstrating the quality of the individual's attachment to his proposed domicile. The individual's motive in seeking to establish a new domicile, the duration of his relationship to the locale, abandonment of a prior residence, and the location of assets and friends have all been recognized as demonstrating attachment to the proposed domicile.

VI.

Plaintiffs have proposed that DPW should follow those states that, in other contexts, consider the "mosaic of circumstances" surrounding an incompetent individual's assertion of domicile and adopt a "substantial contacts" test for residency. To satisfy the requirements of the Rehabilitation Act, DPW must show that adoption of such a test would interfere with the essential nature of its program or be unduly burdensome. We believe that the consideration of relevant circumstances in

14

evaluating an incompetent individual's legal assertion of domicile will neither alter the essential nature of the program nor be unduly burdensome.

A.

To establish a change of domicile under a "substantial contacts" test, the individual, or those acting in his behalf, must be able to demonstrate good faith. Ordinarily, competent individuals may establish a change of domicile by demonstrating a sincere or good faith intention to remain in the new location, and the absence of any intent to go elsewhere. For a competent individual, it makes no difference whether his motive is good or bad. Motive becomes relevant to the good faith inquiry only when one's purpose in moving to the new location betrays a lack of intention to remain. Here, however, the good faith of those seeking to establish that an incompetent individual has changed his domicile assumes an added significance. Under the Rehabilitation Act, it may interfere with the essential purpose of the program for DPW to recognize a change of domicile for individuals whose only motive in moving is to obtain state funded services. Accordingly, under the Rehabilitation Act, the good faith of those seeking to establish a change of domicile for an incompetent individual seeking state funded services may be tested by examining the motive behind the change of residence.

Objective factors that will be probative of good faith will include the length and likely duration of the individual's residence, his financial or other connections to the locale, and the quality of his contacts with other locations. In other

15

contexts, there is no minimum period of residence required for establishing a new domicile. But where we are examining the motive of those seeking to establish a change of domicile for the purpose of receiving state-funded services under the Rehabilitation Act, duration of residence will be of particular significance. Also relevant, although not dispositive, is the individual's subjective attachment to his home. We recognize that incompetent individuals will have varying abilities to express their subjective preferences and the weight attributable to this factor will vary accordingly. Because this inquiry is directed at discovering the extent of the individual's attachment to Pennsylvania, a residency determination made on the basis of these factors will not alter the essential nature of the program.

The opinions of parents or guardians who are acting in the incompetent individual's best interest also will be probative. We note that this last factor is different from the kind of surrogacy we rejected in Easley v. Snider, 36 F.3d 297 (3d Cir. 1994). In Easley, mental alertness was part of the essential nature of a program designed "to allow the physically disabled to live in the least restrictive environment as independently as possible." Id. at 302. Accordingly, we held:

> [The use of surrogates] would shift [the focus of the program] from the provision of attendant care and its societal objectives for the physically disabled to personal care services to the many thousands of physically disabled who are often served by other specially designed state programs. The proposed alteration would create a program that the State never envisioned when it enacted the Care Act.

16

_Id._ at 305. But here, mental capacity to choose domicile is not a criterion fundamental to participation in the program. A parent or guardian's interpretation of the individual's wishes will not disrupt the objectives of the program.

B.

DPW also objects that administration of a substantial contacts test would be unduly burdensome. "Accommodations that are `reasonable' must not unduly strain financial resources." Nathanson v. Medical College of Pennsylvania, 926 F.2d at 1386. DPW, however, has not shown that a "substantial contacts" test would create an undue financial burden. DPW predicts a substantial contacts test would be susceptible to abuse, opening the door "for out-of-state parents to attempt to present sham residency claims on behalf of their incompetent children," and "encourag[ing] counties to place their residents in other counties' facilities, if not out-of-state facilities," and abandon their funding obligations by declaring them residents of the new county or state. We are skeptical of these predictions. First, DPW has offered no evidence that the proposed modification would likely lead to these results. Second, we have injected a threshold good faith inquiry to forestall this kind of abuse and these hypothesized strategies would likely fail a substantial contacts test that looks at duration of residence, quality of contacts to the new locale, and relationships to other locations. And finally, we require the Commonwealth to consider substantial contacts only when traditional residency tests discriminatorily exclude retarded individuals.

17

As we have noted, the Juvelises have conceded that Niki lacks the mental capacity to choose a domicile, but his parents are clearly acting in good faith and in his best interests when they assert Niki is domiciled in Pennsylvania. DPW has not met its burden of proving that it would impose an undue burden on the Commonwealth to consider substantial contacts to determine whether Niki has established domicile in Pennsylvania.[0]

## VII.

We will affirm the district court's judgment that DPW has failed to carry its burden of proving that it would interfere with the essential nature of the program or be unduly burdensome to allow Niki to rebut the presumption that he maintains his parents' domicile.

Nevertheless, our inquiry does not end there. Niki must establish that he has in fact changed his residence from that of his parents. The Juvelises have pointed to several

---

[0]DPW claims there is no presumption that the profoundly retarded cannot prove the requisite intent. According to the agency, residency determinations are made "on a case-by-case basis," and the policy "says nothing whatsoever" about who can or cannot form the requisite intent. Indeed, as plaintiff points out, if Niki were capable of declaring an intent to make Pennsylvania his home, DPW would not accept such a declaration as determinative, but would consider other factors that supported or contradicted such a conclusion.

Nevertheless, DPW insists that consideration of substantial contacts to Pennsylvania would be unworkable. It appears to us that, in practice, DPW relies exclusively on its presumption that a profoundly retarded individual takes the domicile of his parent as of the time he turned eighteen.

DPW also has pointed out that the Juvelises did not seek review of DPW's eligibility decision. Given DPW's application of its presumption that profoundly retarded individuals cannot manifest an intent to change domicile, we believe a request for review would have been futile.

18

objective factors that support the conclusion that Niki has established a domicile in Pennsylvania: Niki has resided at Melmark for eighteen years, all of his friends and possessions are there, his parents have paid substantial fees to the Delaware County home over those years, and it is expected that Niki will continue to reside in Pennsylvania for the rest of his life. Furthermore, within his limited ability to do so, Niki has expressed a subjective attachment to Melmark.[0] Finally, his parents are clearly acting in good faith and in Niki's best interest in asserting that Melmark is Niki's home. We conclude that Niki has made a sufficient showing to establish a change of domicile to Pennsylvania.

## VIII.

DPW has failed to prove that a modification of its policy to allow Niki to show a change of domicile to Pennsylvania would be unduly burdensome. Accordingly, we hold that a mentally incompetent individual who has been denied state funded services by operation of the presumption that incompetents cannot intend a change of domicile may rebut that presumption. The individual must demonstrate good faith and must show substantial contacts to Pennsylvania in order to establish that he has adopted a Pennsylvania domicile. We believe the Juvelises have made the requisite showing and will affirm the judgment of the district court.

---

[0] Melmark is the only home he remembers, he repeats the word "Melmark" when he is off the grounds, and he turns his wheelchair and heads towards his cottage at Melmark when told it is time to go home.

19