**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**June 16, 2003**

**Charles R. Fulbruge III**
**Clerk**

Revised July 21, 2003

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 02-10642

_____

MARY VIRGINIA ACRIDGE, Individually and as
Independent Executrix of the Estate of
LOUIS E ACRIDGE, Deceased; DANIEL ACRIDGE BROYLES

                            Plaintiffs - Appellees

    v.

THE EVANGELICAL LUTHERAN GOOD SAMARITAN SOCIETY, ET AL

                            Defendants

THE EVANGELICAL LUTHERAN GOOD SAMARITAN SOCIETY;
JERRY L ADAMS; ELAINE MORROW; SHERRI LUNSFORD HARRIS

                            Defendants - Appellants

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

Before KING, Chief Judge, and DAVIS, Circuit Judge, and VANCE,
District Judge.[*]

KING, Chief Judge:

_____

[*] District Judge of the Eastern District of Louisiana,
sitting by designation.

Asserting diversity jurisdiction, the plaintiffs filed suit in federal court seeking damages under Texas law for the death of Louis Acridge in a Texas nursing home. The defendants Evangelical Lutheran Good Samaritan Society, Jerry Adams, Elaine Morrow, and Sheri Lunsford Harris appeal the denial of their motion for summary judgment on official immunity grounds. They also raise the issue of whether there is federal subject matter jurisdiction over the underlying proceeding. Because we conclude that complete diversity among the parties is lacking, we vacate the district court's order denying summary judgment and remand with instructions to dismiss the case for lack of subject matter jurisdiction.

I. FACTS AND PROCEDURAL BACKGROUND

In 1968, Louis Acridge moved from Colorado to New Mexico, where he was employed as a sheriff and lived with his wife, Plaintiff-Appellee Mary Acridge. In 1996, Mary placed Louis in a retirement center in New Mexico as a result of a rapid deterioration in his mental status caused by Alzheimer's dementia. Mary became dissatisfied with the treatment Louis was receiving and, in 1997, transferred him to the Farwell Convalescent Center in Farwell, Texas.[1] By that time, Louis was

---

[1] Defendant Evangelical Lutheran Good Samaritan Society ("Good Samaritan") operated the Farwell Convalescent Center. Defendant Jerry Adams was an administrator at the Center; defendants Elaine Morrow and Sherri Lunsford Harris were the directors of nursing at the Center during times relevant to this case.

completely unable to take care of himself, was disoriented as to time and place, had little memory, and was virtually unaware of his surroundings.  When Mary moved Louis to Texas, she applied for and received Medicaid benefits from the Texas Department of Human Services.  The Texas Medicaid statute states:

Texas Residence Requirements

(a) General requirements.  To be eligible for the Texas Title XIX Medical Assistance Program, an individual must be a resident of the State of Texas; that is, he must have established residence in Texas and he must intend to remain in Texas.
. . .
(b) Eligibility requirements for persons from another state.  If a client is eligible for Title XIX benefits in another state and receives benefits in that state, he is not eligible for Title XIX benefits from the state of Texas.

40 TEX. ADMIN. CODE. § 15.301 (West 2000).

After being at the Center for more than a year, Louis Acridge was placed in a room with Henry Plyler, another resident. Plyler had a history of abusive behavior toward past roommates. On June 23, 1999, staff members at the Center discovered Acridge in his bed, covered in blood; a ballpoint pen protruded from his right eye.  An investigation revealed that Plyler had beaten Acridge on the head with a coffee mug and then stabbed him in the eye with a pen.  The pen penetrated Acridge's brain; he died eight hours later as a result of this wound.

In their First Amended Complaint filed June 7, 2001, the plaintiffs alleged that the defendants negligently failed to protect Louis Acridge from Plyler and that this failure was the

3

proximate cause of Acridge's death. The plaintiffs also claimed that the defendants were negligent in failing to warn Acridge and his family of the known risks that Plyler presented to his roommates. The defendants filed a motion to dismiss the suit on the grounds that no federal subject matter jurisdiction existed; the plaintiffs brought suit in federal court under diversity jurisdiction, but the defendants argued that complete diversity was lacking because both Louis Acridge and the defendants were Texas domiciliaries. The district court denied this motion without stated reasons.

The defendants also moved for summary judgment, claiming that each defendant was entitled to official immunity from suit. The defendants further asserted that Plyler's unforeseeable criminal conduct was a superceding cause of Acridge's death that absolved the defendants of liability for any alleged negligent conduct. The district court, again without stated reasons, denied the defendants' motion for summary judgment.

The defendants now bring this interlocutory appeal of the district court's denial of their summary judgment motion, arguing that the court should have granted their motion claiming official immunity. The defendants also urge us to examine whether there is diversity jurisdiction over these claims.

II. WHETHER DIVERSITY JURISDICTION EXISTS OVER THESE CLAIMS

Federal court jurisdiction here hinges on the domicile of Mary Acridge in her capacity as Independent Executrix of the

Estate of Louis Acridge.  Under 28 U.S.C. § 1332(c)(2) (2000),
the legal representative of the estate of a decedent is deemed to
be a citizen of the same state as the decedent for diversity
purposes.  Jurisdiction in this case rests on a single question:
when Mary Acridge moved Louis Acridge into a Texas nursing home,
did he become a Texas domiciliary?  If he did, then complete
diversity among the parties is lacking and the case cannot be
heard in federal court.  Temple Drilling Co. v. La. Ins. Guar.
Ass'n, 946 F.2d 390, 393 (5th Cir. 1991).  If not, then he
remained a New Mexico domiciliary and complete diversity with the
defendants exists.[2]

A.    General Law of Domicile

A brief overview of the law of domicile will be helpful in
our exploration of this question.  First, while we may look to
state law for guidance, the question of a person's domicile is a
matter of federal common law.  Coury v. Prot, 85 F.3d 244, 248
(5th Cir. 1996); see also 15 Moore's Federal Practice
§ 102.34[3][a] (3d ed. 2001) (reporting cases from eight circuits
taking this position).  A person acquires a "domicile of origin"
at birth, and this domicile is presumed to continue absent
sufficient evidence of change.  See, e.g., Palazzo v. Corio, 232
F.3d 35, 42 (2d Cir. 2000).  There is a presumption of continuing

---

[2]    Mary Acridge is a Colorado domiciliary and her son, also
a plaintiff, is a New Mexico domiciliary.  The individual
defendants are all Texas domiciliaries; Good Samaritan is a North
Dakota corporation.

domicile that applies whenever a person relocates. Coury, 85 F.3d at 250. In order to defeat the presumption and establish a new domicile (the "domicile of choice"), the person must demonstrate both (1) residence in a new state, and (2) an intention to remain in that state indefinitely. Id. ("Mere presence in a new location does not effect a change of domicile; it must be accompanied with the requisite intent."). There is no durational residency requirement in the establishment of domicile; once presence in the new state and intent to remain are met, the new domicile is instantaneously established. 15 Moore's Federal Practice, § 102.34[10] (3d ed. 2001).

In determining whether a person has changed his domicile, courts have identified many factors which should be considered. Coury, 81 F.3d at 251 ("The factors may include the places where the litigant exercises civil and political rights, pays taxes, owns real and personal property, has driver's and other licenses, maintains bank accounts, belongs to clubs and churches, has places of business or employment, and maintains a home for his family."). The court should, when undertaking this examination, weigh all factors equally; no single factor is determinative. Id. Additionally, statements of intent, either to remain in a previous domicile or to establish a new one, are "entitled to little weight" if they conflict with the objective facts. Id.

B.    Law of Domicile for Incompetent Persons

Of course, the intent inquiry becomes more problematic when the person in question has, like Louis Acridge, become mentally incompetent. Only minimal competency is required to choose a new domicile; even if the person in question has been adjudged incompetent by a court and is incapable of managing his own affairs, he can change his domicile so long as "he understands the nature and effect of his act." Juvelis by Juvelis v. Snider, 68 F.3d 648, 655 (3d Cir. 1995). However, an incompetent is presumed to lack the mental capacity to change his own domicile. Id. at 654.

Where someone acting on an incompetent's behalf moves the incompetent to another state, the question becomes whether that move (coupled with the trappings of intent for the incompetent to remain in the new state indefinitely) should be permitted to change the incompetent's domicile. There is a split in the circuits (and no Fifth Circuit precedent) on the question of whether someone acting on behalf of an incompetent can change the incompetent's state of domicile.

In Rishell v. Jane Phillips Episcopal Memorial Medical Center, 12 F.3d 171 (10th Cir. 1993), the legal guardian of a person rendered incompetent while living in Oklahoma relocated the person to Louisiana in order to obtain better medical care. Id. at 172. When the guardian then attempted to sue an Oklahoma hospital in federal court on behalf of the patient, the hospital moved to dismiss on the grounds that, because the guardian lacked

7

the authority to change the patient's domicile, no diversity jurisdiction existed.  Id.  The Tenth Circuit concluded that, where the incompetent will never regain sufficient mental capacity to choose his own domicile, "the law must allow another, vested with legal authority, to determine domicile for the best interests of that person."  Id. at 174; see also Restatement (Second) of Conflict of Laws § 23 cmt. f (1988) (noting that a court-appointed guardian can shift the domicile of an incompetent to another state "if this shift of domicile would be in the best interests of the incompetent and was not made to achieve some selfish purpose of the guardian").  As the court in Rishell pointed out, to refuse to permit a guardian to change the domicile of the person entrusted to his care would essentially "leave the incompetent in a never-ending limbo where the presumption against changing domicile becomes more important than the interests of the person the presumption was designed to protect."  Rishell, 12 F.3d at 174.  The Seventh Circuit agreed with this conclusion.  Dakuras v. Edwards, 312 F.3d 256, 258 (7th Cir. 2002) ("The responsibility for making the essential life choices of children and wards is vested not in them but in their parents or guardians, and we cannot see why the choice of domicile should not be treated as one of those life choices.").

However, the Fourth Circuit takes the opposite position.  In Long v. Sasser, 91 F.3d 645 (4th Cir. 1996), the court concluded that a guardian could not change the domicile of an incompetent,

8

even if the move was made in the best interests of the incompetent.  Id. at 647-48 (citing Foster v. Carlin, 200 F.2d 943 (4th Cir. 1952)).  The court rejected the reasoning proffered in Rishell, finding that such a "best interests" inquiry required speculating both as to what was in the best interests of the incompetent as well as to whether the incompetent would ever regain sufficient mental capacity to choose a domicile of his own volition.  Id. at 647.  Some commentators have agreed with this reasoning.  Larry L. Teply, The Elderly and Civil Procedure: Service and Default, Capacity Issues, Preserving and Giving Testimony, and Compulsory Physical or Mental Examinations, 30 Stetson L. Rev. 1273, 1278-80 & n. 33 (2001) (citing Long with approval and rejecting the Rishell approach as introducing "undesirable uncertainties into subject matter determinations").

The defendants urge us to adopt the position taken by the Seventh and Tenth Circuits (and rejected by the Fourth Circuit) that someone acting in the "best interests" of an incompetent may change the incompetent's domicile.[3]  After carefully considering the arguments set forth in each case, we agree with the Seventh

---

[3]  Each of the prior cases dealing with this question has involved a court-appointed guardian with recognized legal capacity to act on behalf of the incompetent; the record in this case does not reveal that Mary Acridge took the step of having herself appointed her husband's legal guardian.  However, neither party argued, here or in the district court, that Rishell, Long, or Dakuras should be distinguishable on that basis; as such, we will treat the arguments to that effect as having been waived. Trevino v. Johnson, 168 F.3d 173, 181 n.3 (5th Cir. 1999).

and Tenth Circuits and hold that Mary Acridge had the authority to change the domicile of Louis Acridge so long as she was acting in his best interests.

An incompetent sits in an unenviable position in society, unable to fend for himself and completely dependent upon those closest to him. We agree with the Tenth Circuit: To hold that the person charged with making decisions on behalf of an incompetent lacks the authority to change the incompetent's state of domicile in his best interests leaves the incompetent "in a never-ending limbo where the presumption against changing domicile becomes more important than the interests of the person the presumption was designed to protect." Rishell, 12 F.3d at 174. Further, the principal argument put forth in Long that such a standard introduces unwanted uncertainty into the domicile analysis is unpersuasive. Long, 91 F.3d at 647. No more uncertainty exists in determining whether someone is acting in the best interests of an incompetent than exists when a court must consider and weigh the multitude of relevant factors in determining the domicile of a competent adult. Coury, 85 F.3d at 251. We see no reason for a per se rule against changing domicile in this situation; in examining the domicile of both competent and incompetent adults, analysis of the facts and circumstances of the case presents the court with the best opportunity to reach the appropriate conclusion. See 15 Moore's Federal Practice, § 102.34[4] (3d ed. 2001) (noting that some

10

courts consider the question of domicile to be a mixed question of law and fact which is so fact-dependent that it is reviewed under the clearly erroneous standard reserved for questions of fact); Coury, 81 F.3d at 251 (adopting this position in the Fifth Circuit).

C.    Analysis of Louis Acridge's Domicile

Before turning to the "best interests" inquiry, we must first contend with arguments made by each party that Louis Acridge's domicile has already been determined as a matter of law.  The defendants rely on the fact that Mary Acridge applied for and received Medicaid benefits in the state of Texas. According to the Texas statute, only someone who has both "established residence in Texas" and has an "inten[t] to remain in Texas" is eligible for Medicaid benefits.  40 TEX. ADMIN. CODE. § 15.301(a).  The defendants conclude, therefore, that Louis Acridge's domicile changed "through operation of law" when he applied for and received benefits that he could only be eligible for as a Texas domiciliary.  See, e.g., In re Gillmore's Estate, 243 A.2d 263, 268 (N.J. Super. Ct. App. Div. 1968) (remarking that "a person who lacks capacity to acquire a new domicile by choice" can acquire a domicile "through operation of law" if that person's actions, regardless of her lack of intent, demonstrate that her domicile has actually changed).

If we were to accept this argument, we would be expanding the general rule that a "domicile by operation of law" can be

11

established only where "the law confers upon one party the control of the domicile of another because of the lack of competence of the latter."  Eugene F. Scales & Peter Hay, Conflict of Laws, § 4.42 (1st ed. 1984).  "Domicile by operation of law" typically limits itself to domestic relations situations, such as the common law rule that a married woman took the domicile of her husband or the rule that an unemancipated child has the domicile of his parents.  8 C.J.S. Domicile, § 9 (2002) ("Domicile by operation of law . . . ordinarily results from legal domestic relations.").  Nothing in the Texas Medicaid statute purports to create a domicile based upon the act of applying for benefits – the statute merely limits eligibility to Texas domiciliaries.

However, while the defendants cannot argue that Louis Acridge's domicile changed by operation of law, their reliance on Mary's application for Texas Medicaid benefits for Louis as a factor favoring a finding of changed domicile is persuasive. According to the federal regulations governing state Medicaid eligibility:

> (3)   For any institutionalized individual who became incapable of indicating intent at or after age 21, the State of residence [for purposes of Medicaid eligibility] is the State in which the individual is physically present, except where another State makes a placement.

> (4)   For any other institutionalized individual, the State of residence is the State where the individual is living with the intention to remain there permanently or for an indefinite period.

12

42 C.F.R. § 435.403(i)(3)-(4) (2002).  The definition of "State of residence" in subsection (4) mimics the generally understood definition of "domicile" – including the definition set forth in the Texas Medicaid statute.  <u>See</u> Restatement (Second) of Conflict of Laws § 11 cmt. k (1988) ("Statutes in the United States rarely speak in terms of domicil but use 'residence' instead.  Residence is an ambiguous word whose meaning in a legal phrase must be determined in each case.  Frequently it is used in a sense equivalent to domicil."); <u>see also</u> <u>Martinez v. Bynum</u>, 461 U.S. 321, 330 (1983) (stating that "residence" requires both "physical presence and an intention to remain"); <u>Arredondo v. Brockette</u>, 648 F.2d 425, 431 (5th Cir. 1981) ("The word 'residence' has many meanings in the law, largely determined by the statutory context in which it is used.").  Thus, the use of the term "State of residence" in subsection (3) can be understood to mean "domicile"; it follows that, for Medicaid purposes, someone who is over the age of 21, lives in an institution, and is incapable of forming intent is considered to be a domiciliary of the state in which he physically resides.  Thus, under the applicable Medicaid regulations, Louis Acridge was a Texas domiciliary for Medicaid purposes.

However, we decline to accept the defendants' related argument that, because Louis Acridge was a Texas domiciliary for purposes of Medicaid law, he must also be a Texas domiciliary for purposes of determining diversity jurisdiction.  The general rule

13

is that "[a] person has only one domicile at a particular time." Knapp v. State Farm Ins., 584 F.Supp. 905, 907 (E.D. La. 1984). However, more specifically, the rule is that a person may not have more than one domicile at a time "at least for the same purpose." Restatement (Second) of Conflict of Laws § 11(b) & cmts. m & n (1988) ("A person may have no more than one domicil at a time, at least for the same purpose. . . . [T]he core of domicil everywhere is the same. But in close cases, decision of a question of domicil may sometimes depend upon the purpose for which the domicil concept is used in the particular case."). Thus, while the fact that Medicaid law makes someone a Texas domiciliary for Medicaid purposes could be a factor to be considered in determining domicile for diversity purposes, it is not conclusive on that question.

The plaintiffs argue that this court must find that Louis Acridge is a New Mexico domiciliary because a New Mexico state court, in probating Louis Acridge's will, found that it had venue over the case "because the Decedent's domicile at the time of death was Clovis, Curry County, New Mexico." The plaintiffs seek to rely upon the principles of collateral estoppel (combined with the Full Faith and Credit Clause) to conclude that the defendants are bound by that determination of Louis Acridge's domicile and may not relitigate the question in these proceedings.

Where a party seeks to use an issue decided in state court to preclude relitigation in federal court, the federal court

14

must, under the full faith and credit doctrine, give that issue the same preclusive effect that the courts of the state which decided the issue would give it.  28 U.S.C. § 1738 (2000); see also Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 375 (1996).  Under New Mexico law, a party seeking to invoke collateral estoppel based upon a previous state court decision must demonstrate: (1) the causes of action in the previous and current suits are different; (2) the issue in question was "actually litigated" in the previous suit; (3) the issue in question was necessary to the outcome of the previous suit; and (4) "the party to be bound by collateral estoppel had a full and fair opportunity to litigate the issue in the prior suit."  Hyden v. Law Firm of McCormick, Forbes, Caraway & Tabor, 848 P.2d 1086, 1091 (N.M. Ct. App. 1993).

While this suit certainly presents a different cause of action than the probating of Acridge's estate, the plaintiffs cannot satisfy the remainder of the test.  There is no evidence that the issue of Louis Acridge's domicile was ever fully litigated in state court; all we have is the bare statement by the court that Acridge was a New Mexico domiciliary. Additionally, whether or not Louis Acridge was a New Mexico domiciliary was not necessary to the determination that his estate was eligible for probate in New Mexico; according to state law, the estate of a non-domiciliary can be probated in New Mexico "in any county where property of the decedent was located

15

at the time of his death." N.M. STAT. ANN. § 45-3-201 (Michie 1978). Thus, even if the court found that Louis Acridge was a Texas domiciliary, it still could have permitted probate of the estate on the grounds that Acridge owned property located in New Mexico (as, in fact, he did). Finally, none of the defendants was a party to the probate proceedings, nor were his or her interests represented by someone who was a party to those proceedings. As such, none of the defendants had a full and fair opportunity to litigate the question of Louis Acridge's domicile. Because the plaintiffs cannot satisfy the requirements for collateral estoppel under New Mexico law, this court is not required to give preclusive effect to the determination by the New Mexico state court that Louis Acridge was domiciled in that state.

Having disposed of these arguments, we can now turn to the "best interests" analysis to determine Louis Acridge's domicile, keeping in mind that the burden of proof concerning change of domicile rests with the party seeking to establish that domicile has changed. <u>Juvelis</u>, 68 F.3d at 648. Because the defendants have moved to dismiss for want of jurisdiction, they have the burden of proving that Mary Acridge changed her husband's domicile when she placed him in Falwell Convalescent Center.

Since domicile is a fact-bound question, we would ordinarily remand for the district court to make the necessary determination. This record, however, permits of only one

16

conclusion. Mary Acridge admits that she removed her husband from the Buena Vista Retirement Center in Clovis, New Mexico because she was "dissatisfied with the care that Louis was receiving." There is no evidence in the record that Mary Acridge gained any personal benefit from having her husband moved to another state. Louis Acridge remained in the Farwell Convalescent Center for more than two years before being stabbed by Henry Plyler; there is no evidence in the record that, at any point during his stay, Mary Acridge had grown unhappy with the care her husband was receiving or considered relocating him to a third retirement home in another state. In short, on the evidence in the record, Mary Acridge moved her husband from New Mexico to Texas in order to obtain, in his best interests, the highest possible standard of care for the remainder of his life.

Because Mary Acridge was acting in the best interests of her husband when she moved him to the Farwell Convalescent Center, it is clear that, for purposes of diversity jurisdiction, Louis Acridge was a Texas domiciliary at the time of his death. As such, complete diversity among the parties in this action is lacking. There is no federal subject matter jurisdiction over this case.[4]

IV. CONCLUSION

---

[4] Because we conclude that federal jurisdiction over these claims is lacking, we decline to reach the defendants' additional contentions regarding the district court's denial of their motion for summary judgment on official immunity grounds.

17

We VACATE the district court's order denying the defendants' motion for summary judgment and REMAND the case with instructions to dismiss for lack of subject matter jurisdiction.  Costs shall be borne by the plaintiffs.